UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------

In re:                 :     Chapter 7
                       :     Case No: 08-14106(REG)

SILVIA NUER,             :
         Debtor         :

-----------------------------------------------------------

## AFFIRMATION OF JAY TEITELBAUM IN SUPPORT OF OBJECTION TO DEBTOR'S APPLICATION FOR ORDER PURSUANT TO BANKRUPTCY RULE 2004; AND CROSS APPLICATION FOR A PROTECTIVE ORDER PURSUANT TO FED. BANKR. RULES 7026(C) AND 9014

      **JAY TEITELBAUM**, an attorney duly admitted to practice law in the State of New York and before this Court, hereby affirms under penalty of perjury:

1. I am a partner in the law firm of Teitelbaum & Baskin, LLP, attorneys for JPMorgan Chase Bank, N.A. as servicer ("JPMorgan") for Deutsche Bank National Trust Company, as Trustee ("DBank") for Long Beach Mortgage Loan Trust 2006-2 ("LBMLT 2006-2").

2. I am not a party to this proceeding and I submit this affirmation in support of the (i) objection by JPMorgan to the application of Silvia Nuer (the "Debtor") for an order pursuant to Federal Bankruptcy Rules 2004 to authorize document and deposition discovery of JPMorgan (the "Application"); and (ii) in support of the cross application by JPMorgan for a protective order pursuant to Fed. Bankr. R. 7026(c) and 9014.

3. Prior to filing the annexed objection and cross application, I conferred (telephonically) with Mr. Shaev, as counsel for the Debtor to attempt to the resolve discovery disputes. After a good faith discussion, the parties agreed to adjourn the presentment date of the Application (to a date to be obtained from the Court) to provide the undersigned additional time to file it pleadings, but were unable to resolve their dispute without seeking the intervention of this Court.

4. A true and accurate copy of the Payoff Statement for the Loan as of April 30, 2009 is annexed hereto as Exhibit A.

5. A true and accurate copy of the relevant provisions of the Purchase and Assumption Agreement among the FDIC, Receiver of Washington Mutual Bank, FDIC and JPMorgan Chase Bank, N.A., dated as of September 25, 2008 is annexed hereto as Exhibit B.

6. True and accurate copies of letters dated March 16 and March 31, 2009 from Natalie Grigg to Linda Tirelli are annexed hereto as Exhibit C.

Dated: May 3, 2009                 /s/ Jay Teitelbaum

**EXHIBIT A**

PAYOFF STATEMENT
04-29-09

TO:                    RE:    Loan Number: 0697215101
Sylvia N Nuer                 Client Number: 156-B
                              Sylvia N Nuer
                              1651 Metropolitan Ave 7c
                              Bronx NY 10462

Loan Type - Conventional

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PAYOFF FIGURES MUST BE VERIFIED WITHIN 24 HOURS PRIOR TO PAYOFF.
If we receive an insufficient amount to pay off the loan, we must
receive funds to cover the deficiency by 3:00 ET on the same
business day. If we do not receive the funds to cover the
deficiency by 3:00 ET on the same business day, we will return the
payoff funds in the same manner as they were remitted. Interest
will continue to accrue, late charges may be incurred, and other
activity or transactions may take place on the loan until sufficient
funds are received to pay the loan in full.
\*\*\*\*PLEASE CALL TOLL FREE 1-866-926-8937 TO VERIFY PAYOFF
FIGURES\*\*\*\*

AMOUNTS DUE

A. The next payment due date is 10-01-07. Payment of the following
   amounts are required to pay the loan in full on 04-30-09:

| | | |
|---|---|---|
| Current Total Unpaid Principal Balance | $ | 102,718.47 |
| Interest to 04-30-09 | $ | 15,552.87 |
| Recoverable Balance | $ | 3,565.00 |
| Late Charges | $ | 81.45 |
| Recording Cost | $ | 42.00* |
| Total amount to Pay Loan in Full on 04-30-09 | $ | 121,959.79 |

B. The following amounts are additional fees and costs that are due
   relating to this loan:

| | | |
|---|---|---|
| Other Outstanding Fees | $ | 79.15 |
| Payoff Statement Fee | $ | .00** |
| Reconveyance Fee | $ | .00 |
| Trustee Fee | $ | .00 |
| TOTAL AMOUNT DUE | $ | 122,038.94 |

  \*Please exclude the Recording Cost if the transaction involves a
  Consolidation, Extension and Modification Agreement or the
  sale or refinance of a cooperative unit.
   \*\*Payoff Statement Fee is due from the requesting person or entity.
If not paid in full by 04-30-09, add a per diem of $ 24.48.

PAYOFF FIGURES MUST BE VERIFIED 24 HOURS PRIOR TO PAYOFF.
ADDITIONAL AMOUNTS MAY BE INCURRED THAT CHANGE THE PAYOFF
AMOUNT.
The total amount necessary to pay off the loan is subject to final
verification from the note holder. Washington Mutual reserves the
right to adjust these figures at any time for any reason. This
includes, but is not limited to, an error in calculating the payoff
amount, dishonored payments, disbursements with escrow accounts,
advances and adjustments made from the date of this Statement to
the crediting of the payoff funds. You may not rely on the "Total
 Amount" due shown unless you confirm those amounts by contacting
Washington Mutual toll free at 1-866-926-8937.

The per diem interest amount applies to conventional and VA loans
and is valid only until the earlier of 04-30-09 or, if the loan is
an adjustable rate loan, the next interest rate change date. This
per diem interest amount does not apply to FHA loans, other than FHA
loans originated in Illinois on or after January 1, 1986. Failure to
pay all other FHA loans in full on a monthly payment due date will
result in another month's interest accruing and being due on the loa
at payoff. Interest will be charged to, but not including, the day
payoff funds are received. PAYOFF FUNDS RECEIVED ON A MONDAY MUST
INCLUDE INTEREST FOR THE PRECEDING SATURDAY AND SUNDAY. A late
charge of $ 16.29 will be assessed and added to the total amount
due if any payment is not received within 15 days after the due date

ALL REMITTANCES MUST BE MADE BY CASHIER'S CHECK, CERTIFIED
FUNDS, OR
WIRE TRANSFER. FUNDS MUST BE RECEIVED BY 3:00 ET.

CHECK REMITTANCE:                    WIRE REMITTANCE:
Washington Mutual                    Washington Mutual
Attn: Payoff Unit, STE 156           ABA Number: 3222-7162-7
7255 Baymeadows Way                  Beneficiary: Washington Mutual Bank
Jacksonville, FL 32256               Beneficiary Acct: 0950151375
                                     OBI Text: Sylvia N Nuer
                                     Loan Payoff Number: 0697215101

-Include borrower's name, loan number and property address on check.
-Wire must be formatted exactly as shown above. Do not use Bank to
 Bank Information (BBI). Remitter's name, phone number, and fax
 number must be referenced on the wire.

**EXHIBIT B**

PURCHASE AND ASSUMPTION AGREEMENT

WHOLE BANK

AMONG

FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF WASHINGTON MUTUAL BANK,
HENDERSON, NEVADA

FEDERAL DEPOSIT INSURANCE CORPORATION

and

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

DATED AS OF

SEPTEMBER 25, 2008

# TABLE OF CONTENTS

**ARTICLE I**      **DEFINITIONS** ....................................................................................................**2**

**ARTICLE II**     **ASSUMPTION OF LIABILITIES**.............................................................**8**

2.1       Liabilities Assumed by Assuming Bank .......................................................8
2.2       Interest on Deposit Liabilities ......................................................................8
2.3       Unclaimed Deposits ....................................................................................8
2.4       Omitted .......................................................................................................9
2.5       Borrower Claims..........................................................................................9

**ARTICLE III**    **PURCHASE OF ASSETS** ...........................................................................**9**

3.1       Assets Purchased by Assuming Bank ..........................................................9
3.2       Asset Purchase Price....................................................................................9
3.3       Manner of Conveyance; Limited Warranty;
            Nonrecourse; Etc. ......................................................................................10
3.4       Puts of Assets to the Receiver....................................................................10
3.5       Assets Not Purchased by Assuming Bank ..................................................11
3.6       Assets Essential to Receiver ......................................................................11

**ARTICLE IV**     **ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS**........**13**

4.1       Continuation of Banking Business..............................................................13
4.2       Agreement with Respect to Credit Card Business .......................................13
4.3       Agreement with Respect to Safe Deposit Business .....................................13
4.4       Agreement with Respect to Safekeeping Business .....................................13
4.5       Agreement with Respect to Trust Business .................................................13
4.6       Agreement with Respect to Bank Premises .................................................14
4.7       Agreement with Respect to Leased Data
            Processing Equipment..................................................................................16
4.8       Agreement with Respect to Certain
            Existing Agreements...................................................................................16
4.9       Informational Tax Reporting ......................................................................17
4.10      Insurance ...................................................................................................17
4.11      Office Space for Receiver and Corporation ................................................17
4.12      Omitted ......................................................................................................18
4.13      Omitted ......................................................................................................18

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

**ARTICLE V**    **DUTIES WITH RESPECT TO DEPOSITORS**
                 **OF THE FAILED BANK..................................................................18**

5.1    Payment of Checks, Drafts and Orders ....................................................18
5.2    Certain Agreements Related to Deposits ..................................................18
5.3    Notice to Depositors ................................................................................18

**ARTICLE VI**   **RECORDS..........................................................................................19**

6.1    Transfer of Records..................................................................................19
6.2    Delivery of Assigned Records ................................................................20
6.3    Preservation of Records ..........................................................................20
6.4    Access to Records; Copies.......................................................................20

**ARTICLE VII**  **BID; INITIAL PAYMENT ....................................................................20**

**ARTICLE VIII** **PROFORMA .........................................................................................20**

**ARTICLE IX**   **CONTINUING COOPERATION............................................................21**

9.1    General Matters........................................................................................21
9.2    Additional Title Documents.....................................................................21
9.3    Claims and Suits ......................................................................................21
9.4    Payment of Deposits ...............................................................................22
9.5    Withheld Payments ..................................................................................22
9.6    Proceedings with Respect to Certain Assets
       and Liabilities..........................................................................................22
9.7    Information................................................................................................23

**ARTICLE X**    **CONDITION PRECEDENT ....................................................................23**

**ARTICLE XI**   **REPRESENTATIONS AND WARRANTIES OF THE**
                 **ASSUMING BANK ..............................................................................23**

**ARTICLE XII**  **INDEMNIFICATION .............................................................................24**

12.1   Indemnification of Indemnitees ...............................................................25
12.2   Conditions Precedent to Indemnification.................................................27
12.3   No Additional Warranty............................................................................28
12.4   Indemnification of Corporation and Receiver...........................................29
12.5   Obligations Supplemental........................................................................29
12.6   Criminal Claims.......................................................................................29
12.7   Limited Guaranty of the Corporation........................................................29
12.8   Subrogation..............................................................................................30

iii

**ARTICLE XIII    MISCELLANEOUS** ...............................................................................**30**

13.1      Entire Agreement ...................................................................30
13.2      Headings ................................................................................30
13.3      Counterparts...........................................................................30
13.4      Governing Law .....................................................................30
13.5      Successors..............................................................................30
13.6      Modification; Assignment ....................................................31
13.7      Notice .....................................................................................31
13.8      Manner of Payment...............................................................31
13.9      Costs, Fees and Expenses .....................................................32
13.10     Waiver....................................................................................32
13.11     Severability ...........................................................................32
13.12     Term of Agreement................................................................32
13.13     Survival of Covenants, Etc. ..................................................32

**SCHEDULES**

2.1      Certain Liabilities Not Assumed..................................................34
3.2      Purchase Price of Assets or Assets ............................................35
3.5      Certain Assets Not Purchased....................................................37

**EXHIBIT**

3.2(c)      Valuation of Certain Qualified Financial Contracts ...................38

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

## PURCHASE AND ASSUMPTION AGREEMENT

## WHOLE BANK

**THIS AGREEMENT**, made and entered into as of the 25th day of September, 2008, by and among the **FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER of WASHINGTON MUTUAL BANK, HENDERSON, NEVADA** (the "Receiver"), **JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**, organized under the laws of the United States of America, and having its principal place of business in Seattle, Washington (the "Assuming Bank"), and the **FEDERAL DEPOSIT INSURANCE CORPORATION**, organized under the laws of the United States of America and having its principal office in Washington, D.C., acting in its corporate capacity (the "Corporation").

### WITNESSETH:

**WHEREAS**, on Bank Closing, the Chartering Authority closed Washington Mutual Bank (the "Failed Bank") pursuant to applicable law and the Corporation was appointed Receiver thereof; and

**WHEREAS**, the Assuming Bank desires to purchase substantially all of the assets and assume all deposit and substantially all other liabilities of the Failed Bank on the terms and conditions set forth in this Agreement; and

**WHEREAS**, pursuant to 12 U.S.C. Section 1823(c)(2)(A), the Corporation may provide assistance to the Assuming Bank to facilitate the transactions contemplated by this Agreement, which assistance may include indemnification pursuant to Article XII; and

**WHEREAS**, the Board of Directors of the Corporation (the "Board") has determined to provide assistance to the Assuming Bank on the terms and subject to the conditions set forth in this Agreement; and

**WHEREAS**, the Board has determined pursuant to 12 U.S.C. Section 1823(c)(4)(A) that such assistance is necessary to meet the obligation of the Corporation to provide insurance coverage for the insured deposits in the Failed Bank and is the least costly to the deposit insurance fund of all possible methods for meeting such obligation.

**NOW THEREFORE**, in consideration of the mutual promises herein set forth and other valuable consideration, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth in this Article I, or elsewhere in this Agreement. As used herein, words imparting the singular include the plural and vice versa.

"**Accounting Records**" means the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances.

"**Acquired Subsidiaries**" means Subsidiaries of the Failed Bank acquired pursuant to Section 3.1.

"**Adversely Classified**" means, with respect to any Loan or security, a Loan or security which has been designated in the most recent report of examination as "Substandard," "Doubtful" or "Loss" by the Failed Bank's appropriate Federal or State Chartering Authority or regulator.

"**Affiliate**" of any Person means any director, officer, or employee of that Person and any other Person (i) who is directly or indirectly controlling, or controlled by, or under direct or indirect common control with, such Person, or (ii) who is an affiliate of such Person as the term "affiliate" is defined in Section 2 of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. Section 1841.

"**Agreement**" means this Purchase and Assumption Agreement by and among the Assuming Bank, the Corporation and the Receiver, as amended or otherwise modified from time to time.

"**Assets**" means all assets of the Failed Bank purchased pursuant to Section 3.1. Assets owned by Subsidiaries of the Failed Bank are not "Assets" within the meaning of this definition.

"**Assumed Deposits**" means Deposits.

"**Bank Closing**" means the close of business of the Failed Bank on the date on which the Chartering Authority closed such institution.

"**Bank Premises**" means the banking houses, drive-in banking facilities, and teller facilities (staffed or automated) together with appurtenant parking, storage and service facilities and structures connecting remote facilities to banking houses, and land on which the foregoing are located, that are owned or leased by the Failed Bank and that are occupied by the Failed Bank as of Bank Closing.

"**Bid Amount**" has the meaning provided in Article VII.

2

"**Book Value**" means, with respect to any Asset and any Liability Assumed, the dollar amount thereof stated on the Accounting Records of the Failed Bank. The Book Value of any item shall be determined as of Bank Closing after adjustments made by the Assuming Bank for normal operational and timing differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections and for setoffs, whether voluntary or involuntary. The Book Value of a Subsidiary of the Failed Bank acquired by the Assuming Bank shall be determined from the investment in subsidiary and related accounts on the "bank only" (unconsolidated) balance sheet of the Failed Bank based on the equity method of accounting. Without limiting the generality of the foregoing, (i) the Book Value of a Liability Assumed shall include all accrued and unpaid interest thereon as of Bank Closing, and (ii) the Book Value of a Loan shall reflect adjustments for earned interest, or unearned interest (as it relates to the "rule of 78s" or add-on-interest loans, as applicable), if any, as of Bank Closing, adjustments for the portion of earned or unearned loan-related credit life and/or disability insurance premiums, if any, attributable to the Failed Bank as of Bank Closing, and adjustments for Failed Bank Advances, if any, in each case as determined for financial reporting purposes. The Book Value of an Asset shall not include any adjustment for loan premiums, discounts or any related deferred income or fees, or general or specific reserves on the Accounting Records of the Failed Bank.

"**Business Day**" means a day other than a Saturday, Sunday, Federal legal holiday or legal holiday under the laws of the State where the Failed Bank is located, or a day on which the principal office of the Corporation is closed.

"**Chartering Authority**" means (i) with respect to a national bank, the Office of the Comptroller of the Currency, (ii) with respect to a Federal savings association or savings bank, the Office of Thrift Supervision, (iii) with respect to a bank or savings institution chartered by a State, the agency of such State charged with primary responsibility for regulating and/or closing banks or savings institutions, as the case may be, (iv) the Corporation in accordance with 12 U.S.C. Section 1821(c), with regard to self appointment, or (v) the appropriate Federal banking agency in accordance with 12 U.S.C. 1821(c)(9).

"**Commitment**" means the unfunded portion of a line of credit or other commitment reflected on the books and records of the Failed Bank to make an extension of credit (or additional advances with respect to a Loan) that was legally binding on the Failed Bank as of Bank Closing, other than extensions of credit pursuant to the credit card business and overdraft protection plans of the Failed Bank, if any.

"**Credit Documents**" mean the agreements, instruments, certificates or other documents at any time evidencing or otherwise relating to, governing or executed in connection with or as security for, a Loan, including without limitation notes, bonds, loan agreements, letter of credit applications, lease financing contracts, banker's acceptances, drafts, interest protection agreements, currency exchange agreements, repurchase agreements, reverse repurchase agreements, guarantees, deeds of trust, mortgages, assignments, security agreements, pledges, subordination or priority agreements, lien priority agreements, undertakings, security instruments, certificates, documents, legal opinions, participation agreements and intercreditor agreements, and all amendments, modifications, renewals, extensions, rearrangements, and substitutions with respect to any of the foregoing.

3

"**Credit File**" means all Credit Documents and all other credit, collateral, or insurance documents in the possession or custody of the Assuming Bank, or any of its Subsidiaries or Affiliates, relating to an Asset or a Loan included in a Put Notice, or copies of any thereof.

"**Data Processing Lease**" means any lease or licensing agreement, binding on the Failed Bank as of Bank Closing, the subject of which is data processing equipment or computer hardware or software used in connection with data processing activities. A lease or licensing agreement for computer software used in connection with data processing activities shall constitute a Data Processing Lease regardless of whether such lease or licensing agreement also covers data processing equipment.

"**Deposit**" means a deposit as defined in 12 U.S.C. Section 1813(l), including without limitation, outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances and credited on the books and records of the Failed Bank; provided, that the term "Deposit" shall not include all or any portion of those deposit balances which, in the discretion of the Receiver or the Corporation, (i) may be required to satisfy it for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver, including the liability of any depositor as a director or officer of the Failed Bank, whether or not the amount of the liability is or can be determined as of Bank Closing.

"**Failed Bank Advances**" means the total sums paid by the Failed Bank to (i) protect its lien position, (ii) pay ad valorem taxes and hazard insurance, and (iii) pay credit life insurance, accident and health insurance, and vendor's single interest insurance.

"**Fixtures**" means those leasehold improvements, additions, alterations and installations constituting all or a part of Bank Premises and which were acquired, added, built, installed or purchased at the expense of the Failed Bank, regardless of the holder of legal title thereto as of Bank Closing.

"**Furniture and Equipment**" means the furniture and equipment (other than leased data processing equipment, including hardware and software), leased or owned by the Failed Bank and reflected on the books of the Failed Bank as of Bank Closing, including without limitation automated teller machines, carpeting, furniture, office machinery (including personal computers), shelving, office supplies, telephone, surveillance and security systems, and artwork.

"**Indemnitees**" means, except as provided in paragraph (11) of Section 12.1(b), (i) the Assuming Bank, (ii) the Subsidiaries and Affiliates of the Assuming Bank other than any Subsidiaries or Affiliates of the Failed Bank that are or become Subsidiaries or Affiliates of the Assuming Bank, and (iii) the directors, officers, employees and agents of the Assuming Bank and its Subsidiaries and Affiliates who are not also present or former directors, officers, employees or agents of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank.

4

"**Initial Payment**" means the payment made pursuant to Article VII, the amount of which shall be either (i) if the Bid Amount is positive, the Bid Amount plus the Required Payment or (ii) if the Bid Amount is negative, the Required Payment minus the Bid Amount. The Initial Payment shall be payable by the Corporation to the Assuming Bank if the Initial Payment is a negative amount. The Initial Payment shall be payable by the Assuming Bank to the Corporation if the Initial Payment is positive.

"**Legal Balance**" means the amount of indebtedness legally owed by an Obligor with respect to a Loan, including principal and accrued and unpaid interest, late fees, attorneys' fees and expenses, taxes, insurance premiums, and similar charges, if any.

"**Liabilities Assumed**" has the meaning provided in Section 2.1.

"**Lien**" means any mortgage, lien, pledge, charge, assignment for security purposes, security interest, or encumbrance of any kind with respect to an Asset, including any conditional sale agreement or capital lease or other title retention agreement relating to such Asset.

"**Loans**" means all of the following owed to or held by the Failed Bank as of Bank Closing:

(i)     loans (including loans which have been charged off the Accounting Records of the Failed Bank in whole or in part prior to Bank Closing), participation agreements, interests in participations, overdrafts of customers (including but not limited to overdrafts made pursuant to an overdraft protection plan or similar extensions of credit in connection with a deposit account), revolving commercial lines of credit, home equity lines of credit, Commitments, United States and/or State-guaranteed student loans, and lease financing contracts;

(ii)     all Liens, rights (including rights of set-off), remedies, powers, privileges, demands, claims, priorities, equities and benefits owned or held by, or accruing or to accrue to or for the benefit of, the holder of the obligations or instruments referred to in clause (i) above, including but not limited to those arising under or based upon Credit Documents, casualty insurance policies and binders, standby letters of credit, mortgagee title insurance policies and binders, payment bonds and performance bonds at any time and from time to time existing with respect to any of the obligations or instruments referred to in clause (i) above; and

(iii)     all amendments, modifications, renewals, extensions, refinancings, and refundings of or for any of the foregoing;

provided, that there shall be excluded from the definition of "Loans" amounts owing under Qualified Financial Contracts.

"**Obligor**" means each Person liable for the full or partial payment or performance of any Loan, whether such Person is obligated directly, indirectly, primarily, secondarily, jointly, or severally.

Washington Mutual Bank
Henderson, Nevada

Execution Copy
Whole Bank P&A

"**Other Real Estate**" means all interests in real estate (other than Bank Premises and Fixtures), including but not limited to mineral rights, leasehold rights, condominium and cooperative interests, air rights and development rights that are owned by the Failed Bank.

"**Payment Date**" means the first Business Day after Bank Closing.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof, excluding the Corporation.

"**Primary Indemnitor**" means any Person (other than the Assuming Bank or any of its Affiliates) who is obligated to indemnify or insure, or otherwise make payments (including payments on account of claims made against) to or on behalf of any Person in connection with the claims covered under Article XII, including without limitation any insurer issuing any directors and officers liability policy or any Person issuing a financial institution bond or banker's blanket bond.

"**Proforma**" means producing a balance sheet that reflects a reasonably accurate financial statement of the Failed Bank through the date of closing. The Proforma financial statements serve as a basis for the opening entries of both the Assuming Bank and the Receiver.

"**Put Date**" has the meaning provided in Section 3.4.

"**Put Notice**" has the meaning provided in Section 3.4.

"**Qualified Financial Contract**" means a qualified financial contract as defined in 12 U.S.C. Section 1821(e)(8)(D).

"**Record**" means any document, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) of the Failed Bank generated or maintained by the Failed Bank that is owned by or in the possession of the Receiver at Bank Closing.

"**Related Liability**" with respect to any Asset means any liability existing and reflected on the Accounting Records of the Failed Bank as of Bank Closing for (i) indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting such Asset, (ii) ad valorem taxes applicable to such Asset, and (iii) any other obligation determined by the Receiver to be directly related to such Asset.

"**Related Liability Amount**" with respect to any Related Liability on the books of the Assuming Bank, means the amount of such Related Liability as stated on the Accounting Records of the Assuming Bank (as maintained in accordance with generally accepted accounting principles) as of the date as of which the Related Liability Amount is being determined. With respect to a liability that relates to more than one asset, the amount of such Related Liability shall be allocated among such assets for the purpose of determining the Related Liability Amount with

6

respect to any one of such assets. Such allocation shall be made by specific allocation, where determinable, and otherwise shall be pro rata based upon the dollar amount of such assets stated on the Accounting Records of the entity that owns such asset.

"**Required Payment**" means $50,000,000.00.

"**Repurchase Price**" means with respect to any Asset or asset, which shall be determined by the Receiver, the lesser of (a) or (b):

(a) (i) in the event of a negative Bid Amount, the amount paid by the Assuming Bank, discounted by a percentage equal to the quotient produced by dividing the Assuming Bank's Bid Amount by the aggregate Book Value of the Risk Assets of the Failed Bank;

(ii) in the event of a negative Bid Amount, the amount resulting from (a)(i), above, or in the event of a positive Bid Amount, the amount paid by the Assuming Bank, (x) for a Loan, shall be decreased by any portion of the Loan classified "loss" and by one-half of any portion of the Loan classified "doubtful" as of the date of Bank Closing, and (y) for any Asset or asset, including a Loan, decreased by the amount of any money received with respect thereto since Bank Closing and, if the Asset is a Loan or other interest bearing or earning asset, the resulting amount shall then be increased or decreased, as the case may be, by interest or discount (whichever is applicable) accrued from and after Bank Closing at the lower of: (i) the contract rate with respect to such Asset, or (ii) the Settlement Interest Rate; net proceeds received by or due to the Assuming Bank from the sale of collateral, any forgiveness of debt, or otherwise shall be deemed money received by the Assuming Bank; or

(b) the dollar amount thereof stated on the Accounting Records of the Assuming Bank as of the date as of which the Repurchase Price is being determined, as maintained in accordance with generally accepted accounting principles, and, if the asset is a Loan, regardless of the Legal Balance thereof and adjusted in the same manner as the Book Value of a Failed Bank Loan would be adjusted hereunder.

Provided, however, (b), above, shall not be applicable and the Bid Amount shall be considered to have been positive for Loans repurchased pursuant to Section 3.4(a).

"**Risk Assets**" means (i) all Loans purchased hereunder, excluding (a) New Loans and (b) Loans to the extent secured by Assumed Deposits (and not included in (i)(a)), plus (ii) the Accrued Interest Receivable, Prepaid Expense, and Other Assets.

"**Safe Deposit Boxes**" means the safe deposit boxes of the Failed Bank, if any, including the removable safe deposit boxes and safe deposit stacks in the Failed Bank's vault(s), all rights and benefits (other than fees collected prior to Bank Closing) under rental agreements with respect to such safe deposit boxes, and all keys and combinations thereto.

"**Settlement Date**" means the first Business Day immediately prior to the day which is one hundred eighty (180) days after Bank Closing, or such other date prior thereto as

7

may be agreed upon by the Receiver and the Assuming Bank. The Receiver, in its discretion, may extend the Settlement Date.

"**Settlement Interest Rate**" means, for the first calendar quarter or portion thereof during which interest accrues, the rate determined by the Receiver to be equal to the equivalent coupon issue yield on twenty-six (26)-week United States Treasury Bills in effect as of Bank Closing as published in The Wall Street Journal; provided, that if no such equivalent coupon issue yield is available as of Bank Closing, the equivalent coupon issue yield for such Treasury Bills most recently published in The Wall Street Journal prior to Bank Closing shall be used. Thereafter, the rate shall be adjusted to the rate determined by the Receiver to be equal to the equivalent coupon issue yield on such Treasury Bills in effect as of the first day of each succeeding calendar quarter during which interest accrues as published in The Wall Street Journal.

"**Subsidiary**" has the meaning set forth in Section 3(w)(4) of the Federal Deposit Insurance Act, 12 U.S.C. Section 1813(w)(4), as amended.

## ARTICLE II
## ASSUMPTION OF LIABILITIES

2.1     **Liabilities Assumed by Assuming Bank**. Subject to Sections 2.5 and 4.8, the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"). Notwithstanding Section 4.8, the Assuming Bank specifically assumes all mortgage servicing rights and obligations of the Failed Bank.

2.2     **Interest on Deposit Liabilities**. The Assuming Bank agrees that it will assume all deposit contracts as of Bank Closing, and it will accrue and pay interest on Deposit liabilities assumed pursuant to Section 2.1 at the same rate(s) and on the same terms as agreed to by the Failed Bank as existed as of Bank Closing. If such Deposit has been pledged to secure an obligation of the depositor or other party, any withdrawal thereof shall be subject to the terms of the agreement governing such pledge.

2.3     **Unclaimed Deposits**. If, within eighteen (18) months after Bank Closing, any depositor of the Failed Bank does not claim or arrange to continue such depositor's Deposit assumed pursuant to Section 2.1 at the Assuming Bank, the Assuming Bank shall, within fifteen (15) Business Days after the end of such eighteen (18)-month period, (i) refund to the Corporation the full amount of each such Deposit (without reduction for service charges), (ii) provide to the Corporation an electronic schedule of all such refunded Deposits in such form as may be prescribed by the Corporation, and (iii) assign, transfer, convey and deliver to the Receiver all right, title and interest of the Assuming Bank in and to Records previously transferred to the Assuming Bank and other records generated or maintained by the Assuming Bank pertaining to such Deposits. During such eighteen (18)-month period, at the request of the

8

Corporation, the Assuming Bank promptly shall provide to the Corporation schedules of unclaimed deposits in such form as may be prescribed by the Corporation.

   2.4   **Omitted**.

   2.5   **Borrower Claims**. Notwithstanding anything to the contrary in this Agreement, any liability associated with borrower claims for payment of or liability to any borrower for monetary relief, or that provide for any other form of relief to any borrower, whether or not such liability is reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, legal or equitable, judicial or extra-judicial, secured or unsecured, whether asserted affirmatively or defensively, related in any way to any loan or commitment to lend made by the Failed Bank prior to failure, or to any loan made by a third party in connection with a loan which is or was held by the Failed Bank, or otherwise arising in connection with the Failed Bank's lending or loan purchase activities are specifically not assumed by the Assuming Bank.

## ARTICLE III
## PURCHASE OF ASSETS

   3.1   **Assets Purchased by Assuming Bank**. Subject to Sections 3.5, 3.6 and 4.8, the Assuming Bank hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank whether or not reflected on the books of the Failed Bank as of Bank Closing. Assets are purchased hereunder by the Assuming Bank subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1. The subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated being purchased by the Assuming Bank includes, but is not limited to, the entities listed on Schedule 3.1a. Notwithstanding Section 4.8, the Assuming Bank specifically purchases all mortgage servicing rights and obligations of the Failed Bank.

   3.2   **Asset Purchase Price**.

(a)   All Assets and assets of the Failed Bank subject to an option to purchase by the Assuming Bank shall be purchased for the amount, or the amount resulting from the method specified for determining the amount, as specified on Schedule 3.2, except as otherwise may be provided herein. Any Asset, asset of the Failed Bank subject to an option to purchase or other asset purchased for which no purchase price is specified on Schedule 3.2 or otherwise herein shall be purchased at its Book Value. Loans or other assets charged off the Accounting Records of the Failed Bank prior to the date of Bank Closing shall be purchased at a price of zero.

9

(b)    The purchase price for securities (other than the capital stock of any Acquired Subsidiary) purchased under Section 3.1 by the Assuming Bank shall be the market value thereof as of Bank Closing, which market value shall be (i) the "Mid/Last", or "Trade" (as applicable), market price for each such security quoted at the close of the trading day effective on Bank Closing as published electronically by Bloomberg, L.P.; (ii) provided, that if such market price is not available for any such security, the Assuming Bank will submit a bid for each such security within three days of notification/bid request by the Receiver (unless a different time period is agreed to by the Assuming Bank and the Receiver) and the Receiver, in its sole discretion will accept or reject each such bid; and (iii) further provided in the absence of an acceptable bid from the Assuming Bank, each such security shall not pass to the Assuming Bank and shall be deemed to be an excluded asset hereunder.

(c)    Qualified Financial Contracts shall be purchased at market value determined in accordance with the terms of Exhibit 3.2(c). Any costs associated with such valuation shall be shared equally by the Receiver and the Assuming Bank.

**3.3    Manner of Conveyance; Limited Warranty; Nonrecourse; Etc.** THE CONVEYANCE OF ALL ASSETS, INCLUDING REAL AND PERSONAL PROPERTY INTERESTS, PURCHASED BY THE ASSUMING BANK UNDER THIS AGREEMENT SHALL BE MADE, AS NECESSARY, BY RECEIVER'S DEED OR RECEIVER'S BILL OF SALE, "AS IS", "WHERE IS", WITHOUT RECOURSE AND, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT, WITHOUT ANY WARRANTIES WHATSOEVER WITH RESPECT TO SUCH ASSETS, EXPRESS OR IMPLIED, WITH RESPECT TO TITLE, ENFORCEABILITY, COLLECTIBILITY, DOCUMENTATION OR FREEDOM FROM LIENS OR ENCUMBRANCES (IN WHOLE OR IN PART), OR ANY OTHER MATTERS.

**3.4    Puts of Assets to the Receiver.**

(a)    **Omitted**.

(b)    **Puts Prior to the Settlement Date.** During the period from Bank Closing to and including the Business Day immediately preceding the Settlement Date, the Assuming Bank shall be entitled to require the Receiver to purchase any Asset which the Assuming Bank can establish is evidenced by forged or stolen instruments as of Bank Closing. The Assuming Bank shall transfer all such Assets to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Bank with respect to any such Asset, as provided in Section 12.4.

(c)    **Notices to the Receiver.** In the event that the Assuming Bank elects to require the Receiver to purchase one or more Assets, the Assuming Bank shall deliver to the Receiver a notice (a "Put Notice") which shall include:

(i)    a list of all Assets that the Assuming Bank requires the Receiver to purchase;

10

**EXHIBIT C**

(ii)    a list of all Related Liabilities with respect to the Assets identified pursuant to (i) above; and

(iii)    a statement of the estimated Repurchase Price of each Asset identified pursuant to (i) above as of the applicable Put Date.

Such notice shall be in the form prescribed by the Receiver or such other form to which the Receiver shall consent. As provided in Section 9.6, the Assuming Bank shall deliver to the Receiver such documents, Credit Files and such additional information relating to the subject matter of the Put Notice as the Receiver may request and shall provide to the Receiver full access to all other relevant books and records.

(d)    **Purchase by Receiver**. The Receiver shall purchase Loans that are specified in the Put Notice and shall assume Related Liabilities with respect to such Loans, and the transfer of such Loans and Related Liabilities shall be effective as of a date determined by the Receiver which date shall not be later than thirty (30) days after receipt by the Receiver of the Credit Files with respect to such Loans (the "Put Date").

(e)    **Purchase Price and Payment Date**. Each Loan purchased by the Receiver pursuant to this Section 3.4 shall be purchased at a price equal to the Repurchase Price of such Loan less the Related Liability Amount applicable to such Loan, in each case determined as of the applicable Put Date. If the difference between such Repurchase Price and such Related Liability Amount is positive, then the Receiver shall pay to the Assuming Bank the amount of such difference; if the difference between such amounts is negative, then the Assuming Bank shall pay to the Receiver the amount of such difference. The Assuming Bank or the Receiver, as the case may be, shall pay the purchase price determined pursuant to this Section 3.4(e) not later than the twentieth (20th) Business Day following the applicable Put Date, together with interest on such amount at the Settlement Interest Rate for the period from and including such Put Date to and including the day preceding the date upon which payment is made.

(f)    **Servicing**. The Assuming Bank shall administer and manage any Asset subject to purchase by the Receiver in accordance with usual and prudent banking standards and business practices until such time as such Asset is purchased by the Receiver.

(g)    **Reversals**. In the event that the Receiver purchases an Asset (and assumes the Related Liability) that it is not required to purchase pursuant to this Section 3.4, the Assuming Bank shall repurchase such Asset (and assume such Related Liability) from the Receiver at a price computed so as to achieve the same economic result as would apply if the Receiver had never purchased such Asset pursuant to this Section 3.4.

3.5    **Assets Not Purchased by Assuming Bank**. The Assuming Bank does not purchase, acquire or assume, or (except as otherwise expressly provided in this Agreement) obtain an option to purchase, acquire or assume under this Agreement the assets or Assets listed on the attached Schedule 3.5.

3.6    **Assets Essential to Receiver**.



Mailing Address
P.O. Box 1291
Buffalo, NY 14240-1291

Overnight Mail
220 Northpointe Parkway
Suite G
Amherst, NY 14228

STEVEN J. BAUM, P.C.
ATTORNEYS AT LAW

Phone Number
716-204-2400

Fax Number
716-204-4600

Web Site
WWW.MBAUM.COM

March 16, 2009

Linda Tirelli, Esq.
The Law Offices of Linda M. Tirelli, Esq.
202 Mamaroneck Avenue, 3rd Floor
White Plains, NY 10601

Dear Ms. Tirelli:

    Re:   In re Nuer

In response to your correspondence dated March 9, 2009, please accept the following:

    1. Ann Garbis is employed by JPMorgan Chase as a Vice President. Enclosed please find a copy of the Certificate of Incumbency that authorizes Ms. Garbis to sign on behalf of JPMorgan Chase.

    2. I have confirmed with my client that the Trust Agreement for Long Beach Mortgage Loan Trust 2006-2 has been filed with the U.S. Security and Exchange Commission and is public record. I am waiting for my client to forward a copy of the cover page for the Trust Agreement, however the entire Trust Agreement is accessible via the website for the U.S. Security and Exchange Commission. Information and documentation pertaining to the Trust Agreement can be found at http://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001350317&owner=include&count=100.

    3. I have confirmed with my client that the Pooling and Servicing Agreement between Long Beach Mortgage Company and Deutsche Bank National Trust Company was filed with the U.S. Security and Exchange Commission and is a public record. I have enclosed a copy of the cover page for the Agreement, however, the entire Agreement can be found at http://www.sec.gov/Archives/edgar/data/1119605/000114420406011136/v037556_ex4-1.htm.

    4. Please be advised that there is no servicing agreement between Deutsche Bank, N.A. and JPMorgan Chase. The servicing agreement was between Washington Mutual Bank (WaMu) and Deutsche Bank, N.A., and JPMorgan Chase stepped into the shoes of WaMu when it purchased WaMu's assets as reflected in the affidavit attached to my reply papers. Additionally, I have included a copy of the Purchase and Acquisition Agreement between the FDIC and my client, JPMorgan Chase. I would draw your attention to Section 2.5, wherein it is specifically noted that JPMorgan Chase did not assume liability for borrower's claims for loans originated by the Failed Bank.

With respect to my settlement offer, I am confirming that we offered $1,500.00 to settle this matter, however, my client does intend to pursue its rights to foreclose on the property and the Motion for Relief will not be withdrawn.

Please feel free to contact me should you have any questions.

Very truly yours,

Natalie A. Grigg

Natalie A. Grigg

Enc.



Mailing Address
P.O. Box 1291
Buffalo, NY 14240-1291

Overnight Mail
220 Northpointe Parkway
Suite G
Amherst, NY 14228

STEVEN J. BAUM, P.C.
ATTORNEYS AT LAW

Phone Number
716-204-2400

Fax Number
716-204-4600

Web Site
WWW.MBAUM.COM

March 31, 2009

Linda Tirelli, Esq.
The Law Offices of Linda M. Tirelli, Esq.
202 Mamaroneck Avenue, 3rd Floor
White Plains, NY 10601

     Re:   In re Nuer

Dear Ms. Tirelli:

Please accept this letter as a response to your Qualified Written Request under the Real Estate Settlement Procedures Act directed to Deutsche Bank and JPMorgan Chase.

Regarding your request for an accounting of several aspects of the loan, including a loan history, advances, escrow activity, etc., attached please find the following: a contractual account history for this loan beginning in March 2006, labeled Exhibit A; labeled as Exhibit B is a copy of the Note and Mortgage; enclosed as Exhibit C is a copy of the Broker Price opinions of value; enclosed as Exhibit D is a payoff statement; enclosed as Exhibit E is a copy of the invoices for preparation of the responsive papers in this matter; and enclosed as Exhibit F is a copy of the transaction code listings and descriptions.

Regarding your request in numbers 1, 2, 3, 6, 7, 12, 17, see Exhibit A.

Regarding your request in numbers 4 and 5, please be advised that no Forced Placed Insurance was purchased or charged to the account.

Regarding your request in number 8, see Exhibit B.

Regarding your request in number 9, see Exhibit C.

Regarding your request in number 14, see Exhibit D.

Regarding your request in number 18, see Exhibit E.

Regarding your requests in numbers 10 and 15, see Exhibit F.

Regarding your request in number 13, please be advised that no such fees were incurred.

Regarding your requests in numbers 11 and 16, see Exhibit A. Please note that because this is a Chapter 7 bankruptcy case, no distinction is made between pre and post petition payments.

Regarding your request in number 19, the current holder of the debt is Deutsche Bank National Trust Company, as Trustee for Long Beach Mortgage Trust 2006-2, 1761 East St. Andrew Place Santa Ana, CA 92705-4934.

Regarding your request in number 20, the current servicer is JPMorgan Chase Bank, National Association, 270 Park Avenue, New York, NY.

Regarding your request in number 29, the attorney retained is Steven J. Baum, P.C., 220 Northpointe Parkway, Suite G, Amherst, New York 14228.

Regarding your request in numbers 21, 22, 23, 24, 25, 26, 27, 28, 30, and 31, please be advised that these items are either not applicable or are outside the scope of RESPA.

Please feel free to contact me should you have any questions.

Very truly yours,

Natalie A. Grigg