UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**NOTICE OF MOTION FOR**
**TERMINATION OF AUTOMATIC**
**STAY**

In Re:

SILVIA NUER

          Debtor.

Case No.: 08-14106-REG
(Chapter 7)

Assigned to:
Hon. ROBERT E. GERBER
Bankruptcy Judge

       Please take notice that JPMorgan Chase Bank National Association as servicer for Deutsche Bank National Trust Company, as Trustee for Long Beach Mortgage Trust 2006-2, a secured creditor of Debtor, by the undersigned attorneys, will move this Court on the 18th day of November, 2008, at 9:45 am or as soon thereafter as counsel can be heard, at the United States Bankruptcy Court, One Bowling Green, 6th Floor , Manhattan, NY 10004-1408 for an Order pursuant to 11 U.S.C. §362(d)(1) and (d)(2) terminating the automatic stay as to movant's interest in real property commonly known as 1651 Metropolitan Avenue 7C, Bronx, NY 10462 and for such other relief as the Court may deem proper.

DATED:    November 14, 2008
              Westbury, New York

                                  Yours, etc.

                        By:      __/s/ Marin L. Buczkowski_____
                                  Marin L. Buczkowski, Esq.
                                  STEVEN J. BAUM, P.C.
                                  Attorneys for Secured Creditor
                                  JPMorgan Chase Bank National Association as servicer for Deutsche Bank National Trust Company, as Trustee for Long Beach Mortgage Trust 2006-2
                                  Office and Post Address:
                                  900 Merchant's Concourse, Suite 412
                                  Westbury, NY 11590
                                  Telephone 716-204-2400

TO:

SILVIA NUER                    Debtor
1735 Purdy Street
Apartment 1-D
Bronx, NY 10462

LINDA TIRELLI, ESQ         Attorney for Debtor
Law Office of Linda Tirelli, Esq.
7 Tall Oaks Lane
New City, NY 10956

DAVID R. KITTAY, ESQ.      Chapter 7 Trustee
Kittay & Gershfeld, PC
100 White Plains Road
2nd Floor
Tarrytown, NY 10591

U.S. Trustee                U.S. Trustee
Office of the U.S. Trustee
33 Whitehall Street
Floor 21
New York, NY 10004

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

<u>**APPLICATION**</u>

In Re:

SILVIA NUER

      Debtor.

Case No.: 08-14106-REG
(Chapter 7)

Assigned to:
Hon. ROBERT E. GERBER
Bankruptcy Judge

   JPMorgan Chase Bank National Association as servicer for Deutsche Bank National Trust Company, as Trustee for Long Beach Mortgage Trust 2006-2 ("Secured Creditor"), by its attorneys Steven J. Baum, P.C., moves to terminate the automatic stay in this case with respect to the real property commonly known as 1651 Metropolitan Avenue 7C, Bronx, NY 10462 and states as follows:

   1.  Secured Creditor is the holder by assignment of a mortgage dated the 6th day of January, 2006 in the amount of $104,000.00 secured by the premises commonly known as 1651 Metropolitan Avenue 7C, Bronx, NY 10462 (the "Mortgaged Premises"). A copy of the Note, Mortgage and Assignment(s) is attached hereto as **Exhibit 'A'**.

   2.  On the 10th day of October, 2008 Debtor Silvia Nuer filed a Petition under Chapter 7 of Title 11 U.S.C. §101 <u>et seq</u> with this Court, and an Order for relief was duly entered.

3.  The Note and Mortgage provide that the Debtor will be in default if he or she does not make full monthly payments on each due date. As of the 10th day of November, 2008, the Debtor is due for 5 payments in the amount of $899.74 which represents the payments due the 1st day of October, 2007 through February, 2008 and 6 payments in the amount of $984.96 which represents the payments due the 1st day of March, 2008 through August, 2008 and 2 payments in the amount of $912.46 which represents the payments due the 1st day of September, 2008 through October, 2008 and has not cured said default. In addition, the payment due the 1st day of November, 2008 is now due and remains unpaid as of the date of this application. Further, if the current default continues, the payment due the 1st day of December, 2008 will be due the date that this application is heard. A Motion for Relief Worksheet is attached hereto as **Exhibit 'B'**.

4.  That as of the 24th day of October, 2008, there was an unpaid principal balance owed on the Note and Mortgage in the sum of $114,717.31, with interest thereon for an estimated amount owing Secured Creditor in the amount of $114,717.31. Interest on the unpaid principal balance will continue to accrue, and to protect its security in the Mortgaged Premises Secured Creditor may be required to make further advances for property taxes, insurance and related matters.

5.  Based upon the Property Valuation, attached hereto as **Exhibit 'C'**, said real property is valued at $137,000.00. Based on the Secured Creditor's lien amount and the value of the Mortgaged Premises, there exists minimal equity in the Mortgaged Premises.

6.  Section 362(d)(1) of the Bankruptcy Code provides in pertinent part that the Court shall grant relief from the stay imposed by Section 362(a) "for cause, including lack of adequate protection of an interest in property..." As set forth above, cause exists to vacate the automatic stay as the Debtor has failed to make monthly mortgage payments to Secured Creditor.

7. Furthermore, Section 362(d)(2) of the Bankruptcy Code provides in pertinent part that the Court shall grant relief from stay imposed by Section 362(a) if "(A) the debtor does not have equity in such property; and (B) such property is not necessary to an effective reorganization." *See,* 11 U.S.C. § 362(d)(2)(A)-(B). Therefore, the Secured Creditor is entitled to relief pursuant to 11 U.S.C. § 362(d)(2) as there exists minimal equity in the Premises after costs of sale. The Secured Creditor submits that the Mortgaged Premises are not necessary for the effective reorganization of the Debtor as the instant case is a Chapter 7 liquidation case.

8. A copy of a proposed Order granting the relief sought by Secured Creditor is annexed hereto as **Exhibit 'D'**.

9. No prior application has been made for the relief requested herein.

**WHEREFORE**, Secured Creditor respectfully requests that an Order be granted terminating the automatic stay immediately as to Secured Creditor's interest in the Mortgaged Premises together with such other, further and different relief as the Court may deem just in this matter.

DATED:    November 14, 2008
            Westbury, New York

Yours, etc.

By:    __/s/ Marin L. Buczkowski_____
        Marin L. Buczkowski, Esq.
        STEVEN J. BAUM, P.C.
        Attorneys for Secured Creditor
        JPMorgan Chase Bank National Association as
        servicer for Deutsche Bank National Trust
        Company, as Trustee for Long Beach Mortgage
        Trust 2006-2
        Office and Post Address:
        900 Merchant's Concourse, Suite 412
        Westbury, NY 11590
        Telephone 716-204-2400

# Exhibit A



# FIXED/ADJUSTABLE RATE NOTE
(LIBOR Index - Rate Caps)

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| January | 6 , 2006 | ANAHEIM | CA |
|---|---|---|---|
| [Date] | | [City] | [State] |

**1651 METROPOLITAN AVE 7C**
**BRONX, NY 10462-6287**

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ **104,000.00** (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is

**LONG BEACH MORTGAGE COMPANY**

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of **8.700** %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on **March 1 , 2006**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on **February 1 , 2036**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at: **P.O. Box 2441, Chatsworth CA 91313-2441**

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ **814.46**. This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **February , 2008**, and on that day every 6th month thereafter. Each date on which my adjustable interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of the London interbank offered rates for six month dollar deposits in the London market based on quotations at five major banks ("LIBOR"), as set forth in the "Money Rates" section of *The Wall Street Journal*, or if the Money Rates section ceases to be published or becomes unavailable for any reason, then as set forth in a comparable publication selected by the Lender. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Four and Ninety Nine Hundredth** percentage point(s) ( **4.990** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

New York Fixed/Adjustable Rate Note - Libor

-4140034 (9609)
41400341 (03/14/05) JMR

ELECTRONIC LASER FORMS, INC. - (800)327-0545



The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **10.700** % or less than **8.700** %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **One** percentage points ( **1.000 %)** from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than **14.700%**, which is called the "Maximum Rate" or less than **8.700** % which is called the "Minimum Rate."

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my adjustable interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note.

If I make a **partial prepayment**, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **FIFTEEN** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **2.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

(A) Until my initial fixed rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 17 of the Security Instrument provides as follows:

**AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**
Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may require immediate payment in full if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person. However, Lender shall not require immediate payment in full if this is prohibited by federal law on the date of this Security Instrument.

If Lender requires immediate payment in full under this Paragraph 17, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is mailed or delivered. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 17 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 17 of the Security Instrument shall instead provide as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Sylvia N Nuer_ (Seal)
SYLVIA N NUER        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

[Sign Original Only]

New York Fixed/Adjustable Rate Note - Libor

-4140034 (9606)
41400343 (03/14/05) JMR

## NOTE

| January | 6 , 2006 | ANAHEIM | | CA |
|---|---|---|---|---|
| Date | | City | | State |

**1651 METROPOLITAN AVE 7C**    **BRONX**      **NY**      **10462-6287**

Property Address

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ **26,000.00** (this amount will be called "principal"), plus interest, to the order of the Lender. The Lender is **LONG BEACH MORTGAGE COMPANY**

. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note will be called the "Note Holder."

**2. INTEREST**

I will pay interest at a yearly rate of **11.100** %.

Interest will be charged on unpaid principal until the full amount of principal has been paid.

**3. PAYMENTS**

I will pay principal and interest by making payments each month of U.S. $ **249.58**

I will make my payments on the **first** day of each month beginning on **March** **1 , 2006** . I will make these payments every month until I have paid all of the principal and interest and any other charges, described below, that I may owe under this Note. If, on **February 1, 2036** I still owe amounts under this Note, I will pay all those amounts, in full, on that date.

I will make my monthly payments at **P.O. Box 2441, Chatsworth CA 91313-2441**

or at a different place if required by the Note Holder.

**4. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any of my monthly payments by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **2.000** % of my overdue payment, but not less than U.S. $ **1.00** and not more than U.S. $ **4.99** . I will pay this late charge only once on any late payment.

**(B) Notice from Note Holder**

If I do not pay the full amount of each monthly payment on time, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date I will be in default. That date must be at least 10 days after the date on which the notice is mailed to me or, if it is not mailed, 10 days after the date on which it is delivered to me.

**(C) Default**

If I do not pay the overdue amount by the date stated in the notice described in (B) above, I will be in default. If I am in default, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(D) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all of its costs and expenses to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**5. THIS NOTE SECURED BY A MORTGAGE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, dated **January 6 , 2006** , protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Mortgage describes how and under what conditions I may be required to make immediate payment in full of all amounts that I owe under this Note.

**NEW YORK** - SECOND MORTGAGE - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT

Form 3933

Page 1 of 2

-75(NY) (0208)

1075-1NY (02/28/03) JMR

VMP MORTGAGE FORMS - (800)521-7291

Initials: XSNN



### 6. BORROWER'S PAYMENTS BEFORE THEY ARE DUE

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

I may make a full prepayment or a partial prepayment without paying any penalty. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes. I may make a full prepayment at any time. If I choose to make a partial prepayment, the Note Holder may require me to make the prepayment on the same day that one of my monthly payments is due. The Note Holder may also require that the amount of my partial prepayment be equal to the amount of principal that would have been part of my next one or more monthly payments.

### 7. BORROWER'S WAIVERS

I waive my rights to require the Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor"); (C) to obtain an official certification of nonpayment (known as a "protest"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my promises under this Note, or who signs this Note to transfer it to someone else also waives these rights. These persons are known as "guarantors, sureties and endorsers."

### 8. GIVING OF NOTICES

Any notice that must be given to me under this Note will be given by delivering it or by mailing it by certified mail addressed to me at the Property Address above. A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by certified mail to the Note Holder at the address stated in Section 3 above. A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

### 9. RESPONSIBILITY OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note. Any guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to do these things. The Note Holder may enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note. Any person who takes over my rights or obligations under this Note will have all of my rights and must keep all of my promises made in this Note. Any person who takes over the rights or obligations of a guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to keep all of the promises made in this Note.

**Default in the payment of this loan agreement may result in the loss of the property securing the loan. Under federal law, you may have the right to cancel this agreement. If you have this right, the creditor is required to provide you with a separate written notice specifying the circumstances and times under which you can exercise this right.**

_Sylvia N. Nuer_ _____ (Seal)         _____ (Seal)
SYLVIA N NUER                        -Borrower                                           -Borrower

_____ (Seal)         _____ (Seal)
                                    -Borrower                                           -Borrower

_____ (Seal)         _____ (Seal)
                                    -Borrower                                           -Borrower

_____ (Seal)         _____ (Seal)
                                    -Borrower                                           -Borrower

*[Sign Original Only]*

# FIXED/ADJUSTABLE RATE NOTE
(LIBOR Index - Rate Caps)

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

**January    6 , 2006**          **ANAHEIM**                          **CA**
[Date]                            [City]                              [State]

**1651 METROPOLITAN AVE 7C**
**BRONX, NY  10462-6287**

[Property Address]

## 1.   BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $  **104,000.00**                   (this amount is called ''principal''), plus interest, to the order of the Lender. The Lender is

**LONG BEACH MORTGAGE COMPANY**

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the ''Note Holder.''

## 2.   INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of          **8.700** %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.   PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on        **March      1 ,  2006** . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on        **February     1 ,  2036** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the ''Maturity Date.''

I will make my monthly payments at :  **P.O. Box 2441, Chatsworth CA 91313-2441**

or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $     **814.46**              . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4.   ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of        **February     ,  2008** , and on that day every 6th month thereafter. Each date on which my adjustable interest rate could change is called a ''Change Date.''

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The ''Index'' is the average of the London interbank offered rates for six month dollar deposits in the London market based on quotations at five major banks (''LIBOR''), as set forth in the ''Money Rates'' section of *The Wall Street Journal*, or if the Money Rates section ceases to be published or becomes unavailable for any reason, then as set forth in a comparable publication selected by the Lender. The most recent Index figure available as of the date 45 days before each Change Date is called the ''Current Index.''

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Four and Ninety Nine Hundredth**          percentage point(s) (     **4.990**          %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

New York Fixed/Adjustable Rate Note - Libor

-4140034 (9608)                    ELECTRONIC LASER FORMS, INC. - (800)327-0545
41400341 (03/14/05) JMR

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **10.700** % or less than **8.700** %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **One** percentage points ( **1.000** %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than **14.700**%, which is called the "Maximum Rate" or less than **8.700** % which is called the "Minimum Rate."

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my adjustable interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note.

If I make a **partial prepayment**, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment.



**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **FIFTEEN** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **2.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

New York Fixed/Adjustable Rate Note - Libor



LOAN NO. 6641562-7905

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

(A) Until my initial fixed rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 17 of the Security Instrument provides as follows:

### AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may require immediate payment in full if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person. However, Lender shall not require immediate payment in full if this is prohibited by federal law on the date of this Security Instrument.

If Lender requires immediate payment in full under this Paragraph 17, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is mailed or delivered. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 17 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 17 of the Security Instrument shall instead provide as follows:

### Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)　　　　_____ (Seal)
**SYLVIA N NUER**　　　　-Borrower　　　　　　　　　　　　　　　　　　-Borrower

_____ (Seal)　　　　_____ (Seal)
　　　　　　　　　　　　-Borrower　　　　　　　　　　　　　　　　　　-Borrower

[Sign Original Only]

New York Fixed/Adjustable Rate Note - Libor

 -4140034 (9608)
41400343 (03/14/06) JMR

Page 3 of 3

## NYC DEPARTMENT OF FINANCE
## OFFICE OF THE CITY REGISTER

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2006011200484002001EE700

Document ID: 2006011200484002  Document Date: 01-06-2006  Preparation Date: 01-12-2006
Document Type: MORTGAGE
Document Page Count: 25

| PRESENTER: | RETURN TO: |
|---|---|
| JUDICIAL TITLE INSURANCE AGENCY, LLC - 82877 | LONG BEACH MORTGAGE COMPANY |
| AS AGENT FOR FIRST AMERICAN PICK-UP | P.O. BOX 201085 |
| 550 MAMARONECK AVENUE, SUITE 202 | STOCKTON, CA 95202 |
| HARRISON, NY 10528 | |
| 914-381-6700 | |

### PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| BRONX | 3944 | 3872 | Entire Lot | 7C | 1651 METROPOLITAN AVENUE |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

### CROSS REFERENCE DATA

CRFN_____ or Document ID_____ or _____ Year____ Reel___ Page____ or File Number_____

### PARTIES

| MORTGAGER/BORROWER: | MORTGAGEE/LENDER: |
|---|---|
| SYLVIA N. NUER | LONG BEACH MORTGAGE COMPANY |
| 1735 PURDY STREET, APT. 1D | 1400 S. DOUGLASS ROAD, SUITE 100 |
| BRONX, NY 10462 | ANAHEIM, CA 92806 |

### FEES AND TAXES

| Mortgage | | | | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 104,000.00 | Recording Fee: $ | 162.00 |
| Taxable Mortgage Amount: | $ | 104,000.00 | Affidavit Fee: $ | 0.00 |
| Exemption: | | | NYC Real Property Transfer Tax Filing Fee: | |
| TAXES: County (Basic): | $ | 520.00 | $ | 0.00 |
| City (Additional): | $ | 1,040.00 | NYS Real Estate Transfer Tax: | |
| Spec (Additional): | $ | 0.00 | $ | 0.00 |
| TASF: | $ | 260.00 | | |
| MTA: | $ | 282.00 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 2,102.00 | | |

RECORDED OR FILED IN THE OFFICE
OF THE CITY REGISTER OF THE
CITY OF NEW YORK
Recorded/Filed        01-20-2006 15:09
City Register File No.(CRFN):
          2006000036164

*City Register Official Signature*



Return To:
LONG BEACH MORTGAGE COMPANY
P.O. BOX 201085
STOCKTON, CA 95202

Said premises is or will be
improved by a 1 or 2 family
dwelling only.

LOAN NO. 6641562-7905

Prepared By:

Section • —     Title #• *82877HAB*

Block • *7944*     County • *Brony*

Lot • *3872*     Town/City • ——

|Space Above This Line For Recording Data| **THE JUDICIAL TITLE INSURANCE AGENCY LLC**

# MORTGAGE

550 MAMARONECK AVENUE
HARRISON, NY 10528
914-381-6700

**WORDS USED OFTEN IN THIS DOCUMENT**
(A) "Security Instrument." This document, which is dated January      6 , 2006
together with all Riders to this document, will be called the "Security Instrument."
(B) "Borrower."
SYLVIA N NUER



whose address is   *1735*        *Apt.*
          PURDY STREET  1D, BRONX, NY 10462

sometimes will be called "Borrower" and sometimes simply "I" or "me."
(C) "Lender."
LONG BEACH MORTGAGE COMPANY
will be called "Lender." Lender is a corporation or association which exists under the laws of
the State of Delaware                          . Lender's address is
1400 S. DOUGLASS RD., SUITE 100, ANAHEIM, CA 92806

NEW YORK - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3033 1/01

-6(NY) (0005).02

Page 1 of 17          Initials: *SNN*

TDNY  VMP MORTGAGE FORMS - (800)521-7291

SAID PREMISES IS OR WILL
BE IMPROVED BY A 1 OR 2
FAMILY DWELLING ONLY.

**(D) "Note."** The note signed by Borrower and dated **January   6  , 2006**  , will be called the "Note." The Note shows that I owe Lender **One Hundred Four Thousand and no/100————————**

Dollars (U.S. $ **104,000.00**                    ) plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by **February     1    , 2036**

**(E) "Property."** The property that is described below in the section titled "Description of the Property," will be called the "Property."

**(F) "Loan."** The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Sums Secured."** The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

**(H) "Riders."** All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [X] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(I) "Applicable Law."** All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

**(J) "Community Association Dues, Fees, and Assessments."** All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

**(K) "Electronic Funds Transfer."** "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items."** Those items that are described in Section 3 will be called "Escrow Items."

**(M) "Miscellaneous Proceeds."** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

**(N) "Mortgage Insurance."** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment."** The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

**(P) "RESPA."** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

Loan No. 6641562-7905

Initials: *SNN*

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

## DESCRIPTION OF THE PROPERTY

I give Lender rights in the Property described in (A) through (G) below:

(A) The Property which is located at    **1651 METROPOLITAN AVE 7C**

[Street]

**BRONX**                                    [City, Town or Village]  , New York    **10462-6282**[Zip Code].

This Property is in    **BRONX**                                    County. It has the following legal description:

**LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF**

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

Loan No. 6641562-7905

Initials: *SNN*

# THE JUDICIAL TITLE INSURANCE AGENCY LLC

## Title No. 82877FA-B

## SCHEDULE A

THE Unit known as Apartment No. 7C (hereinafter called "The Unit") in the Building known as Number N-12 and by the street number 1651 Metropolitan Avenue in the Borough and County of Bronx, City and State of New York designated and described as Unit No. 7C in the Declaration establishing The Parkchester North Condominium (hereinafter called the "Property"), made by the Grantor under the Condominium Act of the State of New York (Article 9-B of the Real Property law of the State of New York), dated December 7, 1972, recorded in the Office of the Register of the City of New York, in the County of the Bronx, on the 11th day of December, 1972, in Reel 198, at Page 65 (hereinafter called the "Declaration") and designated a Tax Lot No. 3872 in Block No. 3944 of Section 15 of the Borough of the Bronx on the Tax Map of the Real Property Assessment Department of the City of New York, and on the Floor Plans of the Building, certified by Edward J. Hurley, Architect, on the 10th day of February, 1972 and filed in the Office of the Register of the City of New York, County of Bronx, on the 11th day of December, 1972 as Condominium Plan No. 2. The land on which the Building containing the Unit is located (and on which the other buildings forming part of The Parkchester North Condominium are located) is described as follows:

ALL those certain lots, pieces or parcels of land, situate, lying and being in the Borough and County of Bronx, City and State of New York, bounded and described as follows:

PARCEL I

BEGINNING at a point on the southerly side of East Tremont Avenue at the easterly end of a curve having a radius of 15 feet connecting the southerly side of East Tremont Avenue with the northeasterly side of Unionport Road;

THENCE easterly along the southerly side of East Tremont Avenue, 593.36 feet;

THENCE south 8 degrees 31 minutes 46.5 seconds east, 35.50 feet to a point or curve;

THENCE on a curve to the left having a radius of 125 feet, a distance of 187.864 feet;

THENCE south 4 degrees 38 minutes 25 seconds east, 4 feet;

THENCE on a curve to the right having a radius of 60.50 feet, a distance of 75.615 feet to a point of tangency;

THENCE south 23 degrees 01 minute and 46.5 seconds east, 26.925 feet to a point of curve;

5NN

# THE JUDICIAL TITLE INSURANCE AGENCY LLC

## Title No. 82877FA-B

### S C H E D U L E  A  (continued)

THENCE on a curve to the left having a radius of 211 feet, a distance of 94.83 feet to a point of compound curve;

THENCE on a curve to the left having a radius of 292.50 feet, distance of 507.956 feet to a point of compound curve;

THENCE on a curve to the left having a radius of 211 feet, a distance of 80.486 feet to a point of tangency;

THENCE north 9 degrees 51 minutes 53.5 seconds east, 43 feet to a point of curve;

THENCE on a curve to the right having a radius of 71 feet, a distance of 71.11 of feet to a point of tangency;

THENCE north 67 degrees 15 minutes 00 seconds east, 52 feet to a point of curve;

THENCE on a curve to the left having a radius of 275 feet, a distance of 151.19 feet to a point of compound curve;

THENCE on a curve to the left having a radius of 106.935 feet, a distance of 82.64 feet to the southerly side of East Tremont Avenue;

THENCE easterly along the southerly side of East Tremont Avenue, 639.645 feet to the westerly side of Purdy Street;

THENCE southerly along the westerly side of Purdy Street, 512.463 feet to the northerly end of a curve connecting the westerly side of Purdy Street with the northerly side of Metropolitan Avenue;

THENCE southerly and westerly along said curve, being a curve to the right having a radius of 30 feet, a distance of 55 feet to the northerly side of Metropolitan Avenue;

THENCE westerly along the northerly side of Metropolitan Avenue, 1424.291 feet to the east end of the easterly of three curves connecting the northerly side of Metropolitan Avenue and the northeasterly side of Unionport Road;

THENCE westerly and northwesterly along said three curves connecting the Avenue and Road as aforesaid, 617.286 feet to the northeasterly side of Unionport Road;

THENCE northwesterly along the northeasterly side of Unionport Road, 869.544 feet to the southeasterly end of the curve connecting northeasterly side of Unionport Road with the southerly side of East Tremont Avenue;



# THE JUDICIAL TITLE INSURANCE AGENCY LLC

## Title No. 82877FA-B

## SCHEDULE A (continued)

THENCE northerly and easterly along said curve, being a curve to the right having a radius of 15 feet, a distance of 31.019 feet to East Tremont Avenue at the point and place of BEGINNING.

PARCEL II

BEGINNING at a point on the easterly side of Purdy Street, distant 291.035 feet southerly from the corner formed by the intersection of the easterly side of Purdy Street with the southerly side of East Tremont Avenue;

THENCE south 88 degrees 31 minutes 20 seconds east, 238.586 feet, south 8 degrees 09 minutes 15.2 seconds east, 90.029 feet and south 16 degrees 16 minutes 22.5 seconds east, 123.053 feet to a point on the northerly side of Metropolitan Avenue distant 90.49 feet westerly from the Northwest corner of Metropolitan Avenue and Castle Hill Avenue;

THENCE westerly along the northerly side of Metropolitan Avenue, 131.24 feet to the easterly end of a curve connecting the northerly side of Metropolitan Avenue with the easterly side of Purdy Street;

THENCE westerly and northerly along said curve, being a curve to the right having a radius of 70 feet, a distance of 91.57 feet to the easterly side of Purdy Street;

THENCE northerly along the easterly side of Purdy Street, 207.045 feet to the point or place of BEGINNING.

TOGETHER with an undivided .0293 percent interest in the common elements of the property (hereinafter called the "common elements").

FOR
CONVEYANCING
ONLY

The policy to be issued under this report will insure the title to such buildings and improvements erected on the premises which by law constitute real property.

TOGETHER with all the right, title and interest of the party of the first part, of, in and to the land lying in the street in front of and adjoining said premises.

Page 3

**BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

## COVENANTS

I promise and I agree with Lender as follows:

**1. Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

**2. Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.

Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

**3. Monthly Payments For Taxes And Insurance.**

**(a) Borrower's Obligations.**

I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

Loan No. 6641562-7905

Initials: _SM_

-6(NY) (0205).02
TDNY51605/04/02/LG

Page 6 of 17

Form 3033 1/01

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

**(b) Lender's Obligations.**

Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

**(c) Adjustments to the Escrow Funds.**

Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

**4. Borrower's Obligation to Pay Charges, Assessments and Claims.** I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security

Loan No: 6641562-7905

-6(NY) (0005).02
TDNY8 (08/04/02) LG

Page 6 of 17

Initials: _SMM_

Form 3033 1/01

Instrument is superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c)

Loan No. 6641562-7905

Initials: _____

-6(NY) (00081.02

TONYF (06/04/02; LG

Page 7 of 17

Form 3033 1/01

Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7. Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

**(a) Maintenance and Protection of the Property.**

I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

**(b) Lender's Inspection of Property.**

Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

Loan No. 6641562-7905

-6(NY) (0005).02
TDNY2 030/04/021-LG

Page 6 of 17

Initials: SW

Form 3033 1/01

**8. Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9. Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance

Loan No. 6641562-7905

Initials: SVV

-6(NY) (0005).02
TDNY9 (08/04/02) LG

Page 9 of 17

Form 3033 1/01

coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has - if any - regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

**11. Agreements About Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in

Loan No. 0641562-7905

Initials: _SNN_

value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the Sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations And of Lender's Rights.**

(a) Borrower's Obligations.

Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

(b) Lender's Rights.

Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to

Loan No. 6641562-7905

Initials: SW

-6(NY) (0005).02
TCNY11 (06/04/02)LG

Form 3033 1/01

delay enforcing any of Lender's rights. to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission.

Loan No. 6641562-7905

If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time

Loan No. 6641562-7905

Initials: _SIVV_

period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS**

I also promise and agree with Lender as follows:

**22. Lender's Rights If Borrower Fails to Keep Promises and Agreements.** Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to

Loan No. 6641562-7905

Initials: _SVN_

-6(NY) (0005).02
TDNY74 (05/04/02) LG

Page 14 of 17

Form 3033 1/01

the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

    (1) The promise or agreement that I failed to keep or the default that has occurred;

    (2) The action that I must take to correct that default;

    (3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;

    (4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;

    (5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

    (6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

**23. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

**24. Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

**25. Borrower's Statement Regarding the Property [check box as applicable].**

[X] This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

[ ] This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

[ ] This Security Instrument does not cover real property improved as described above.

Loan No. 6641562-7905

Initials: SMM

-6(NY) (0005).02
TDNY16 (06/04/02):LO

Page 15 of 17

Form 3033 1/01

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 17 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses:

_____

_Sylvia N Nuer_____(Seal)
SYLVIA N NUER                    -Borrower

_____                    _____(Seal)
                                                                    -Borrower

_____(Seal)          _____(Seal)
                    -Borrower                                    -Borrower

_____(Seal)          _____(Seal)
                    -Borrower                                    -Borrower

_____(Seal)          _____(Seal)
                    -Borrower                                    -Borrower

**STATE OF NEW YORK,** *Queens*          County ss:

On the *6th* day of *January 2006* before me, the undersigned, a notary public in and for said state, personally appeared

*Sylvia N. Nasr*

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

CATERINA L. MASSAREGLI
Notary Public, State of New York
No. 01MA5045089
Qualified in Westchester County
Commission Expires Aug. 14, 2009

Tax Map Information:

Loan No. 6641562-7905
Initials: *SNN*

-6(NY) (0005).02
TDNY-17 (06/04/02) LG

Form 3033 1/01

## *ASSIGNMENT OF MORTGAGE*

County of **BRONX**, State of New York

Assignor: **JPMorgan Chase Bank, National Association, as purchaser of the loans and other assets of (the "Savings Bank") from the Federal Deposit Insurance Corporation, acting as receiver for the Savings Bank and pursuant to its authority under the Federal Deposit Insurance Act, 12 U.S.C. §1821(d), 3415 Vision Drive , Columbus, OH 43219**

Assignee: **Deutsche Bank National Trust Company, as Trustee for Long Beach Mortgage Trust 2006-2, 300 Grand Avenue , Los Angeles, CA 90071**

Original Lender: **Long Beach Mortgage Company**

Mortgage made by SYLVIA N. NUER, dated **the 6th day of January, 2006** in the amount of **One hundred and four thousand dollars ($104,000.00)** and interest, recorded on **the 20th day of January, 2006** in the Office of the Clerk of the County of **BRONX** at **Certificate/Docket Number 2006000036164.**

This said mortgage has not been otherwise assigned.

Property Address: 1651 METROPOLITAN AVENUE 7C, BRONX, NY 10462
SBL # Block 3944, Lot 3872

Know that All Men By These Present in consideration of the sum of One and No/100th Dollars and other good valuable consideration, paid to the above Named assignor, the receipt and sufficiency of which is hereby acknowledged the Said Assignor hereby assigns unto the above named Assignee the said Mortgage, Together with all moneys now owing or that may hereafter become due or owing in Respect thereof, and the full benefit of all the powers and of all the covenants and Provisions therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial interest under the Mortgage.

*TO HAVE AND TO HOLD* the said Mortgage and Note, and also the said property unto the said Assignee forever, subject to the terms contained in said Mortgage and Note.

*THIS* Assignment is not subject to the requirement of Section 275 of the Real Property Law because it is within the secondary mortgage market.

*IN WITNESS WHEREOF*, the Assignor has caused these presents to be signed by its duly authorized officer this __1__ day of ___November___ , 20__09__

*IN PRESENCE OF*

JPMorgan Chase Bank, National Association, as purchaser of the loans and other assets of (the "Savings Bank") from the Federal Deposit Insurance Corporation, acting as receiver for the Savings Bank and pursuant to its authority under the Federal Deposit Insurance Act, 12 U.S.C. §1821(d)

BY: _Scott Walter    Attorney In Fact_

State of MN
County of Dakota ss:

On the 1 day of November in the year 2008, before me, the undersigned, a notary public in and for said state, personally appeared Scott Walter, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument and that such individual made such appearance before the undersigned in the Mendota Heights MN. *(Insert city or political subdivision and state or other place acknowledgment taken--- if acknowledgment is taken outside of New York State)*

Notary Public



ADRIENNE MITCHELL
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2013

**Exhibit B**

-------------------------------------------------x

IN RE                                    CASE NO.08-14106 (REG)
SILVIA NUER

-------------------------------------------------x

---

### RELIEF FROM STAY   REAL ESTATE AND
### COOPERATIVE APARTMENTS

---

I _Sanela Alagic_ - Doc Execution Specialist              <NAME AND TITLE> OF
JPMORGAN CHASE BANK NATIONAL ASSOCIATION AS SERVICER FOR DEUTSCHE BANK
NATIONAL TRUST COMPANY, AS TRUSTEE FOR LONG BEACH MORTGAGE TRUST 2006-2
(HEREINAFTER,  MOVANT ) HEREBY DECLARE (OR CERTIFY, VERIFY, OR STATE):

## BACKGROUND INFORMATION

1. REAL PROPERTY OR COOPERATIVE APARTMENT ADDRESS WHICH IS THE SUBJECT OF THIS
MOTION: 1651 METROPOLITAN AVE. 7C, BRONX, NY 10462

2. LENDER NAME: JPMORGAN CHASE BANK NATIONAL ASSOCIATION AS SERVICER FOR
DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR LONG BEACH MORTGAGE
TRUST 2006-2

3. DATE OF MORTGAGE <MM/DD/YYYY>: 01/06/2006

4. POST-PETITION PAYMENT ADDRESS: 7255 BAYMEADOWS WAY, MAILSTOP JAXB2007,
JACKSONVILLE, FL 32256

## DEBT/VALUE REPRESENTATIONS

5. TOTAL PRE-PETITION AND POST-PETITION INDEBTEDNESS OF DEBTOR(S) TO MOVANT AT
THE TIME OF FILING THE MOTION: $ 114,717.31 GOOD THROUGH 10/24/2008
(Note: this amount may not to be relied on as a  payoff  quotation.)

6. MOVANT S ESTIMATED MARKET VALUE OF THE REAL PROPERTY: $137,000.00

7. SOURCE OF ESTIMATED VALUATION: ONLINE PROPERTY VALUATION

## STATUS OF DEBT AS OF
## THE PETITION DATE

8. TOTAL PRE-PETITION INDEBTEDNESS OF DEBTOR(S) TO MOVANT AS OF PETITION FILING DATE: $ 114,717.31 GOOD THROUGH 10/24/2008

    A. AMOUNT OF PRINCIPAL: $ 102718.47

    B. AMOUNT OF INTEREST: $ 10,889.12

    C. AMOUNT OF ESCROW (taxes and insurance): ($1,941.73   BALANCE)

    D. AMOUNT OF FORCED PLACED INSURANCE EXPENDED BY MOVANT: $ 0.00

    E. AMOUNT OF ATTORNEYS' FEES BILLED TO DEBTOR(S) PRE-PETITION: $ 1260.00

    F. AMOUNT OF PRE-PETITION LATE FEES, IF ANY, BILLED TO DEBTOR(S): $ 81.45

9. CONTRACTUAL INTEREST RATE: 8.700% ADJUSTABLE RATE WITH CHANGE DATE 02/01/2008

| | |
|---|---|
| ORIGINATION TO 01/31/2008: | 8.700% |
| 02/01/2008 TO 07/31/2008: | 9.875% |
| 08/01/2008 TO PRESENT: | 8.875% |

(If interest rate is (or was) adjustable, please list the rate(s) and date(s) the rate(s) was/were in effect on a separate sheet and attach the sheet as an exhibit to this form; please list the exhibit number here:_____.)

10. PLEASE EXPLAIN ANY ADDITIONAL PRE-PETITION FEES, CHARGES OR AMOUNTS CHARGED TO DEBTOR S/DEBTORS ACCOUNT AND NOT LISTED ABOVE:
OTHER FEES: $57.50
FORECLOSURE COSTS: $1652.50

## AMOUNT OF ALLEGED POST-PETITION DEFAULT
## (AS OF 11/04/2008)

11. DATE LAST PAYMENT WAS RECEIVED:    09/10/2007 (APPLIED TO 09/01/2007 CONTRACTUAL MONTHLY MORTGAGE PAYMENT)

12. ALLEGED TOTAL NUMBER OF PAYMENTS DUE POST-PETITION FROM FILING OF PETITION THROUGH PAYMENT DUE ON 11/01/2008. AS THIS IS A CHAPTER 7 CASE, THERE ARE NOW A TOTAL OF 14 CONTRACTUAL PAYMENTS NOW DUE.

13. PLEASE LIST ALL POST-PETITION PAYMENTS ALLEGED TO BE IN DEFAULT:

| ALLEGED PAYMENT DUE DATE | ALLEGED AMOUNT DUE | AMOUNT RECEIVED | AMOUNT APPLIED TO PRINCIPAL | AMOUNT APPLIED TO INTEREST | AMOUNT APPLIED TO ESCROW | LATE FEE CHARGED (IF ANY) |
|---|---|---|---|---|---|---|
| *10/01/2007 | $899.74 | | | | | $16.29 |
| *11/01/2007 | $899.74 | | | | | $16.29 |
| *12/01/2007 | $899.74 | | | | | $16.29 |
| *01/01/2008 | $899.74 | | | | | $16.29 |
| *02/01/2008 | $899.74 | | | | | $16.29 |
| *03/01/2008 | $984.96 | | | | | |
| *04/01/2008 | $984.96 | | | | | |
| *05/01/2008 | $984.96 | | | | | |
| *06/01/2008 | $984.96 | | | | | |
| *07/01/2008 | $984.96 | | | | | |
| *08/01/2008 | $984.96 | | | | | |
| *09/01/2008 | $912.46 | | | | | |
| *10/01/2008 | $912.46 | | | | | |
| 11/01/2008 | $912.46 | | | | | |
| | | | | | | |
| TOTALS: | $13,145.84 | $ | $ | $ | $ | $81.45 |

* AS THIS IS A CHAPTER 7 CASE, THERE ARE ALSO 13 PRE-PETITION MONTHLY MORTGAGE PAYMENTS NOW DUE AS LISTED ABOVE.

14. AMOUNT OF MOVANT S ATTORNEYS FEES BILLED TO DEBTOR FOR THE PREPARATION, FILING AND PROSECUTION OF THIS MOTION: $ 650.00

15. AMOUNT OF MOVANT S FILING FEE FOR THIS MOTION: $ 150.00

16. OTHER ATTORNEYS  FEES BILLED TO DEBTOR POST-PETITION: $ 0.00

17 AMOUNT OF MOVANT S POST-PETITION  INSPECTION FEES: $ 0.00

18. AMOUNT OF MOVANT S POST-PETITION APPRAISAL/BROKER S PRICE OPINION:

$ 0.00

19. Amount of forced placed insurance or insurance provided by the Movant post-petition: $ 0.00

20. Sum held in suspense by Movant in connection with this contract, if applicable: $ 0.00

21. Amount of other post-petition advances or charges, for example taxes, insurance incurred by debtor etc. : $ 0.00

## REQUIRED ATTACHMENTS TO MOTION

PLEASE ATTACH THE FOLLOWING DOCUMENTS TO THIS MOTION AND INDICATE THE EXHIBIT NUMBER ASSOCIATED WITH THE DOCUMENTS.

(1) COPIES OF DOCUMENTS THAT INDICATE MOVANT S INTEREST IN THE SUBJECT PROPERTY. FOR PURPOSES OF EXAMPLE ONLY, A COMPLETE AND LEGIBLE COPY OF THE PROMISSORY NOTE OR OTHER DEBT INSTRUMENT TOGETHER WITH A COMPLETE AND LEGIBLE COPY OF THE MORTGAGE AND ANY ASSIGNMENTS IN THE CHAIN FROM THE ORIGINAL MORTGAGEE TO THE CURRENT MOVING PARTY SHOULD BE ATTACHED. (EXHIBIT A.)

(2) COPIES OF DOCUMENTS ESTABLISHING PROOF OF STANDING TO BRING THIS MOTION. (EXHIBIT A.)

(3) COPIES OF DOCUMENTS ESTABLISHING MOVANT S INTEREST IN THE REAL PROPERTY OR COOPERATIVE APARTMENT WERE PERFECTED. FOR THE PURPOSES OF EXAMPLE ONLY, A COMPLETE AND LEGIBLE COPY OF THE FINANCING STATEMENT (UCC-1) FILED WITH EITHER THE CLERK S OFFICE OR THE REGISTER OF THE COUNTY THE PROPERTY OR COOPERATIVE APARTMENT IS LOCATED IN. (EXHIBIT A.)

# CERTIFICATION FOR BUSINESS RECORDS

I CERTIFY THAT THE INFORMATION PROVIDED IN THIS WORKSHEET AND/OR ANY EXHIBITS ATTACHED TO THIS WORKSHEET WERE MADE AT OR NEAR THE TIME OF THE OCCURRENCE OF THE MATTERS SET FORTH BY, OR FROM INFORMATION TRANSMITTED BY, A PERSON WITH KNOWLEDGE OF THOSE MATTERS, WERE KEPT IN THE COURSE OF THE REGULARLY CONDUCTED ACTIVITY; AND WERE MADE BY THE REGULARLY CONDUCTED ACTIVITY AS A REGULAR PRACTICE.

I FURTHER CERTIFY THAT COPIES OF ANY TRANSACTIONAL DOCUMENTS ATTACHED TO THIS WORKSHEET AS REQUIRED BY PARAGRAPHS 1, 2 AND 3, IMMEDIATELY ABOVE, ARE TRUE AND ACCURATE COPIES OF THE ORIGINAL DOCUMENTS.

# DECLARATION

I _Sandra Alagic_ <NAME AND TITLE> OF JPMORGAN CHASE BANK NATIONAL ASSOCIATION AS SERVICER FOR DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR LONG BEACH MORTGAGE TRUST 2006-2 HEREBY DECLARE (OR CERTIFY, VERIFY, OR STATE) PURSUANT 28 U.S.C. SECTION 1746 UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT BASED ON PERSONAL KNOWLEDGE OF THE MOVANT S BOOKS AND BUSINESS RECORDS.

EXECUTED AT _Jacksonville_ <CITY/TOWN>, _Florida_ <STATE> ON THIS _10_ DAY OF _November_ <MONTH>, 20_08_ <YEAR>.

_(signature)_
<SIGNATURE>

_Sandra Alagic_
<PRINT NAME>

_Doc Execution Specialist_
<TITLE>

JPMORGAN CHASE BANK NATIONAL ASSOCIATION AS SERVICER FOR DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR LONG BEACH MORTGAGE TRUST 2006-2

_7757 Bayberry Rd_
<STREET ADDRESS>

_Jax-Fl- 32256_
<CITY, STATE AND ZIP CODE>

# Exhibit C

**First American CoreLogic**

## Providing effective tools to manage mortgage risk

The First American CoreLogic suite of automated mortgage risk management tools provide the most complete assessment of mortgage risk by examining a comprehensive view of property, borrower and agent characteristics. One click delivers a user-defined priority sequence of collateral risk management and fraud prevention reports that best fit your business needs. To learn more or for additional report assistance please contact a customer care representative at **(888) 288-2009.**

▣ **Report Options**
▣ **Order New Report**

### USER ENTRY INFORMATION

| | |
|---|---|
| **Order #, Tracking ID1, ID2, ID3, ID4** | L30000011D2F232AC0B3BC, |
| **Street Address** | 1651 METROPOLITAN AVE, 7c, BRONX, NY, 10462 |

*Introducing.....*
*C&S Appraisal Services*

# ValuePoint4 Report

Property Address:    **1651 METROPOLITAN AVE 7C, BRONX, NY 10462-6256**
Owner Name:    **NUER SYLVIA N**

## Valuation Result

| | |
|---|---|
| Estimated Value: | $137,000 |
| Estimated Value Range: | $121,000 - $158,000 |
| Value As Of: | 10/24/2008 |
| Processed Date: | 10/24/2008 |
| Score: | 70 |
| Forecast Standard Deviation: | 19 |
| Comment: | VP4 Valuation Successful |

**Last Market Sale Information:**

| | |
|---|---|
| Sale Price: | **$130,000** |
| Sale Date: | **01/06/2006** |
| Sale Type: | |
| Seller Name: | **AWUAH NANA K** |
| 1st Mtg Amount: | **$104,000** |
| 1st Mtg Type: | **CONVENTIONAL** |
| 2nd Mtg Amount: | **$26,000** |

**Prior Sale Information:**

| | |
|---|---|
| Prior Sale Price: | **$65,000** |
| Prior Sale Date: | **01/10/2003** |
| Prior Sale Type: | |
| Prior Seller Name: | |
| Prior 1st Mtg Amount: | **$58,500** |
| Prior 1st Mtg Type: | **C** |

**Location Information:**

| | | | |
|---|---|---|---|
| County: | **BRONX** | APN: | **03944-3872** |
| Census Tract: | 0210.00 | Township Name: | |
| Absentee Owner: | **N** | | |

**Property Information:**

| | | | |
|---|---|---|---|
| Living Area: | **874** | Land Use: | **CONDOMINIUM** |

| Total Rooms: | | Lot Area: | |
|---|---|---|---|
| Bedrooms: | | Year Built / Eff: | / |
| Bath(F/H): | / | Air Conditioning: | N |
| Pool: | N | Fireplace: | N |
| Number of Stories: | 12 | Parking: | |

**Tax Information:**

| Assessed Value: | $10,170 | Assessed Year: | 2008 |
|---|---|---|---|
| Land Value: | $1,972 | Improvement Value: | $8,198 |

**Area Market Sales**

| Comp#: | 1 | | | Distance From Subject: | 0.32 (miles) |
|---|---|---|---|---|---|
| Address: | 1480 PARKCHESTER RD 2E, BRONX, NY 10462-7637 | | | | |
| Owner Name: | TUCKETT VIOLA G | | | Living Area: | 524 |
| Seller Name: | BARKER EDWIN A | | | Total Rooms: | |
| APN: | 03938-2336 | Land Use: | Condominium | Bedrooms: | |
| County: | BRONX | Parking: | | Bath(F/H): | 0 / 0 |
| Sale Price: | $130,000 | Prior Sale Price: | $20,000 | Year Built: | 0 |
| Recording Date: | 09/03/2008 | Prior Rec. Date: | 11/08/1991 | Air Cond: | |
| 1st Mortgage Amount: | $104,000 | Lot Area: | | Fireplace: | N |
| Total Assessed Value: | $11,839 | # of Stories: | 8 | Pool: | N |

| Comp#: | 2 | | | Distance From Subject: | 0.2 (miles) |
|---|---|---|---|---|---|
| Address: | 1507 METROPOLITAN AVE 1B, BRONX, NY 10462-6132 | | | | |
| Owner Name: | DELANO MOLLY | | | Living Area: | 768 |
| Seller Name: | GREEN ERNEST T | | | Total Rooms: | |
| APN: | 03944-2358 | Land Use: | Condominium | Bedrooms: | |
| County: | BRONX | Parking: | | Bath(F/H): | 0 / 0 |
| Sale Price: | $135,000 | Prior Sale Price: | | Year Built: | 0 |
| Recording Date: | 04/15/2008 | Prior Rec. Date: | 05/28/1981 | Air Cond: | |
| 1st Mortgage Amount: | $128,250 | Lot Area: | | Fireplace: | N |
| Total Assessed Value: | $9,467 | # of Stories: | 12 | Pool: | N |

| Comp#: | 3 | | | Distance From Subject: | 0.1 (miles) |
|---|---|---|---|---|---|
| Address: | 1579 METROPOLITAN AVE 6G, BRONX, NY 10462-6214 | | | | |
| Owner Name: | CHOWDHURY SUJAUL K | | | Living Area: | 798 |
| Seller Name: | ROCHESTER AUVIL & GWENDOLYN | | | Total Rooms: | |
| APN: | 03944-4256 | Land Use: | Condominium | Bedrooms: | |
| County: | BRONX | Parking: | | Bath(F/H): | 0 / 0 |
| Sale Price: | $135,000 | Prior Sale Price: | | Year Built: | 0 |
| Recording Date: | 03/21/2008 | Prior Rec. Date: | | Air Cond: | |
| 1st Mortgage Amount: | $0 | Lot Area: | | Fireplace: | N |
| Total Assessed Value: | $10,170 | # of Stories: | 12 | Pool: | N |

| Comp#: | 4 | | | Distance From Subject: | 0.13 (miles) |
|---|---|---|---|---|---|
| Address: | 2130 E TREMONT AVE 3C, BRONX, NY 10462-5711 | | | | |
| Owner Name: | PROCEL VICTOR A | | | Living Area: | 783 |

| | | | | | |
|---|---|---|---|---|---|
| Seller Name: | TAUSCH HELEN | | | Total Rooms: | |
| APN: | 03944-2746 | Land Use: | Condominium | Bedrooms: | |
| County: | BRONX | Parking: | | Bath(F/H): | 0 / 0 |
| Sale Price: | $135,000 | Prior Sale Price: | | Year Built: | 0 |
| Recording Date: | 02/28/2008 | Prior Rec. Date: | | Air Cond: | |
| 1st Mortgage Amount: | $121,500 | Lot Area: | | Fireplace: | N |
| Total Assessed Value: | $9,899 | # of Stories: | 12 | Pool: | N |

| | | | | | |
|---|---|---|---|---|---|
| Comp#: | 5 | | | Distance From Subject: | 0.03 (miles) |
| Address: | 1670 METROPOLITAN AVE MF, BRONX, NY 10462-6913 | | | | |
| Owner Name: | DEODAT HELENA | | | Living Area: | 829 |
| Seller Name: | MUNOZ ANIBAL & ALICIA | | | Total Rooms: | |
| APN: | 03943-4434 | Land Use: | Condominium | Bedrooms: | |
| County: | BRONX | Parking: | | Bath(F/H): | 0 / 0 |
| Sale Price: | $125,000 | Prior Sale Price: | $18,500 | Year Built: | 0 |
| Recording Date: | 12/17/2007 | Prior Rec. Date: | 08/22/1986 | Air Cond: | |
| 1st Mortgage Amount: | $0 | Lot Area: | | Fireplace: | N |
| Total Assessed Value: | $9,616 | # of Stories: | 8 | Pool: | N |

--- Report Separator ---

## First American CoreLogic ZipSelect Data Report

***Market Profile
Rural Indicator***

First American CoreLogic's Zip Profile tool is used to describe **rural determinations**, population density, i
patterns, price trends and economic inumberormation for a particular Zip Code. This inumberormation is to
a basis for understanding the surrounding market. The final determination and definition of "Rural" or any o
condition is at the sole discretion of each user. This inumberormation is derived from statistically extrapola
inumberormation for the 4th quarter of the year 2002, HMDA inumberormation for the year 2000, and Dep
Labor statistics for the year 2000. "Rural" as defined by this tool is a statistically established determination
American CoreLogic. This is an exclusive First American CoreLogic product.

| | |
|---|---|
| **Zip Code:** | **10462** |
| Current Date: | 10/24/2008 |
| State: | NY |
| County: | BRONX |
| **Rural Indicator 2000:** | **Urban** |

| Date Created, Input Code, and Condition Found |
|---|



| | |
|---|---|
| Population: | 58,658 |
| Population Per Mile$^2$: | 29,329 |
| Zip Square Miles: | 2 |
| Dimensions in Miles: | 1.4 x 1.4 |
| Approximate Map Area: | 100 Mile$^2$ |
| Latitude: | 40856700 |

*Map Shading 1990 Family Income: Light-Low // Dark-I*

*Longitude:*          -73865807

| | | | |
|---|---|---|---|
| *Average Home Value Q4 2002:* | $361,646 | *Owner Occupied:* | 21 |
| *Median Home Value Q4 2002:* | $361,356 | *Rental Occupied Units:* | 68 |
| *Home Price Change Q1 2002 - Q2 2002:* | 3% | *Vacant Units:* | 9.5 |
| *Average Household Income 1999:* | $44,577 | | |
| *Total Housing Units:* | 28,012 | | |
| *Housing Units Per Mile$^2$:* | 14,006 | | |
| *Total Mobil Home Units 1990:* | 0 | | |

## *Urban MSA/County Price Indexes For: BRONX, NY*



| IDX | 124.5 | 127.8 | 131.2 | 135.3 | 139.9 | 142.3 | 146.9 | 150.7 | 154.7 | 158 | 162.6 | 167.6 | 173.1 | 177 | 181 | 184.8 | 185.8 | 197.3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 1999 | 1999 | 2000 | 2000 | 2000 | 2000 | 2001 | 2001 | 2001 | 2001 | 2002 | 2002 | 2002 | 2002 | 2003 | 2003 | 2003 | 2003 |
| QTR | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 |

* Fannie Mae/Freddie Mac MSA Level Index

## *County Profile For: BRONX, NY*

| | | | |
|---|---|---|---|
| *Population 2000:* | 1,332,650 | *Percent Unemployment 2000:* | 7.3% |
| *Population Growth 1999 - 2000:* | | *Population in Labor Force 2000:* | 35.9% |
| *Population Growth 1990 - 2000:* | 10.7% | *Owner Occupied:* | 18.5% |
| *Land Area:* | 42.03 mile$^2$ | *Rental Occupied Units:* | 75.9% |
| *Population Per Mile$^2$ 2000:* | 31,707 | *Vacant Units:* | 5.6% |

**Disclaimer of Use**

The predicted Values are based upon automated valuation algorithms, based on data primarily from public record sources and computer decision logic combined to provide a logical calculated estimate of the value of a residential property. The Values are provided to the User "as is" and "as available", and all uses of the Values are at the User's sole risk. All warranties concerning the Values and the underlying data and processes, both express and implied, are hereby expressly excluded, including, without limitation, any warranties of merchantability, accuracy and/or fitness

*First American CoreLogic*
*10360 Old Placerville Road, Suite 100*
*Sacramento, CA 95827*
*P: (888) 288-2009 * F: (916) 455-3851*
clientrequest@corelogic.com

for a particular purpose. In no event will First American CoreLogic or AVM Valuation company
represented herein ("Vendors") be liable to the User or any third party for indirect, incidental,
special or consequential damages of any type whatsoever arising out of or relating in any manner
to these terms, the User's agreement with First American CoreLogic or the Values, whether under
a contract, tort or other theory of liability, even if First American CoreLogic or its Vendors are
aware of the possibility of such damages. The income information provided in the IncomePro
product is based on proprietary statistical processes and was not obtained through any
employment or verification/validation process. The format, content, and methods of all Files, Data
and Values are Confidential.

*www.corelogic.com*

Legal / Privacy

# Exhibit D

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

In Re:

SILVIA NUER

                    Debtor.

_____

**ORDER**

Case No.: 08-14106-REG
(Chapter 7)

Assigned to:
Hon. ROBERT E. GERBER
Bankruptcy Judge

JPMorgan Chase Bank National Association as servicer for Deutsche Bank National Trust Company, as Trustee for Long Beach Mortgage Trust 2006-2, a secured creditor of Debtor, ("Secured Creditor") having moved this Court for an Order modifying the Automatic Stay in this proceeding by permitting said Secured Creditor to foreclose on the mortgage of premises commonly known as 1651 Metropolitan Avenue 7C, Bronx, NY 10462, of which the Debtor is the owner of record, and

The motion having come to be heard before this Court and no opposition having been submitted by DAVID R. KITTAY, ESQ. , the Chapter 7 Trustee, by the U.S. Trustee, or by LINDA TIRELLI, ESQ, counsel for the Debtor, and due deliberation having been had, now

Upon Reading and Filing of the Notice of Motion, the Application of Secured Creditor dated November 14, 2008, and proof of service upon all necessary parties, upon motion of the Office of Steven J. Baum, P.C., it is hereby

ORDERED, that as to the Secured Creditor or its successors or assigns, the automatic stay is terminated, permitting it to foreclose or otherwise pursue its mortgage remedies and rights on the premises commonly known as 1651 Metropolitan Avenue 7C, Bronx, NY 10462; and it is further

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**MEMORANDUM OF LAW**

In Re:

Case No.: 08-14106-REG
(Chapter 7)

SILVIA NUER

Assigned to:
Hon. ROBERT E. GERBER
Bankruptcy Judge

Debtor.

## PRELIMINARY STATEMENT

This is a Motion pursuant to Rule 4001(a)(1) of the Federal Rules and Bankruptcy Procedures to lift the Automatic Stay imposed by §362(a) of the United States Bankruptcy Code. The moving party is seeking relief from the Automatic Stay to exercise its rights under a Mortgage, including, but not limited to, the foreclosure of said mortgage, secured by real property commonly known as 1651 Metropolitan Avenue 7C, Bronx, NY 10462 ("Mortgaged Premises"). The basis for this claim is that the Secured Creditor is inadequately protected nor is there any equity within the meaning of §362(d)(1) and (d)(2) and that the Debtor has failed to maintain mortgage payments to the Secured Creditor, JPMorgan Chase Bank National Association as servicer for Deutsche Bank National Trust Company, as Trustee for Long Beach Mortgage Trust 2006-2 ("Secured Creditor"). All of the necessary parties to this Motion have been served with copies of the Notice and supporting Application.

## FACTS

As set forth in the application of Secured Creditor, the Debtor executed the Mortgage to the Secured Creditor, or its predecessor in interest, in the amount of $104,000.00, which mortgage was secured by the Mortgaged Premises.

On the 10th day of October, 2008, the Debtor, Silvia Nuer filed a Petition under Chapter 7 of Title 11 U.S.C. §101 et seq with this Court, and an Order for Relief was duly entered. That as of October 24, 2008, the amount owed to the Secured Creditor was approximately $114,717.31. Additionally, to protect its security in the Mortgaged Premises, Secured Creditor may be required to make further advances for property taxes, insurance and related matters.

A Property Valuation of the mortgaged premises, a copy of which is attached hereto, reflects a property value of $137,000.00.

## **ARGUMENT**

Section 362(d) provides that "upon request of a party in interest, the court shall grant relief from the automatic stay, (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or (2) with respect to a stay of an action against property under subsection (a) of this section if (a) the debtor does not have any equity in such property; and (b) such property is not necessary to an effective reorganization."

The moving party carries the burden of proof with respect to the issue of equity of the property in question. In re Roxrun Estates, Inc. 74 B.R. 997, 1003 (Bankr. S.D.N.Y. 1987), a secured party is a party in interest for the purposes of §362 motions and by showing that the liens on the property exceed the property's worth, a secured creditor will have met this burden. Id.

Further, in a Chapter 7 case, there can be no question that the property is not necessary for the effective reorganization as the purpose of Chapter 7 is not to reorganize, but rather to self-liquidate. Id. As such, when the Debtor has no equity in the property the automatic stay must be lifted. Id.

As aforementioned, the value of the mortgaged premises is $137,000.00 and as such, no equity exists. Therefore, the stay must be lifted pursuant to §362(d)(1) and (2).

In addition, "a debtor's failure to make regular mortgage payments as they become due constitutes sufficient 'cause' to life the automatic stay." In re Michael Lancelot Taylor, 151 B.R. 646, 648 (Bankr. E.D.N.Y. 1993).

As aforementioned, the Debtor has failed to make 13 payments and the burden shifts to the Debtor to show that the Secured Creditor's interest is otherwise adequately protected. Unless this burden is met, the stay must be lifted pursuant to §362(d)(1).

## CONCLUSION

WHEREFORE, it is respectfully requested that the Automatic Stay be modified with respect to the Mortgaged Premises to permit the Secured Creditor to exercise its rights pursuant to the terms of the Mortgage, and for such other and further relief as this Court deem just and equitable.

STEVEN J. BAUM, P.C.
Attorneys for Secured Creditor
JPMorgan Chase Bank National Association as servicer
for Deutsche Bank National Trust Company, as Trustee
for Long Beach Mortgage Trust 2006-2

By:   __/s/ Marin L. Buczkowski_____
Marin L. Buczkowski, Esq.
Office and Post Address:
900 Merchant's Concourse, Suite 412
Westbury, NY 11590
Telephone 716-204-2400

Subscribed and sworn to before me
this 14th day of November, 2008.
/s/ Lisa A. Cutler

LISA A. CUTLER
Notary Public, State of New York
Qualified in Suffolk County
Commission expires July 26, 2012