```
                    UNITED STATES BANKRUPTCY COURT
1                   SOUTHERN DISTRICT OF NEW YORK

2   ---------------------------------------
    In re:                                 : Case No. 08-14106 (reg)
3           SILVIA NUER,                   : New York, New York
                              Debtor.      : April 19, 2010
4   ---------------------------------------

5        CHAP 7 MATTER - TRANSCRIPT RE TELEPHONE CONFERENCE RE

6     JAY TEITELBAUM'S REQUEST FOR JUDICIAL RELIEF; AND THE UST'S

         REQUEST FOR RULINGS ON ATTORNEY-CLIENT PRIVILEGE.
7
               BEFORE THE HONORABLE ROBERT E. GERBER
8
                  UNITED STATES BANKRUPTCY JUDGE
9
    A P P E A R A N C E S :
10
     For Debtor                   LINDA M. TIRELLI, ESQ.
                                   202 Mamaroneck Avenue, 3rd Fl.
11                                 White Plains, New York 10601
                                   (914) 946-0860; (914) 946-0870
12

13   For J.P. Morgan:             JAY TEITELBAUM, ESQ.
                                   Teitelbaum & Baskin, LLP
14                                 3 Barker Avenue, 3rd Floor
                                   White Plains, New York 10601-1509
15                                 (914) 437-7670; (914) 437-7672 fax

16

17   For the UST Office:          GREG MICHAEL ZIPES, ESQ.
                                   33 Whitehall Street
18                                 New York, New York 10004-2112
                                   (212) 510-0500
19

20                                 April CHARNEY, ESQ.
                                   Jacksonville Legal Aid
21

22   Transcription Service:       A-1 Transcripts
                                   A1@Court-Transcripts.net
23

24
         Proceedings recorded by electronic sound recording.
25         Transcript produced by transcription service.
```

1          THE COURT:  Who do I have on the phone please?

2          MS. TIRELLI:  Good morning, Your Honor.  It's Linda

3   Tirelli.

4          THE COURT:  All right, Ms. Tirelli.

5          MR. TEITELBAUM:  And you have Jay Teitelbaum, Your

6   Honor.

7          THE COURT:  All right, Mr. Teitelbaum.

8          MR. ZIPES:  Greg Zipes, Your Honor.

9          THE COURT:  Okay.

10         MS. CHARNEY:  April Charney, Jacksonville Legal Aid.

11         THE COURT:  All right.  Fair enough.  All right,

12  folks, as far as I understand all of the letters that I read in

13  preparation for this call, we have two principle agenda items;

14  one being Mr. Teitelbaum's request for judicial relief as a

15  consequence of the conduct of the recent Reyes (ph.) deposition

16  and the second being Mr. Zipes' request for rulings on attorney-

17  client privilege.

18              As I said, I have read all of that stuff you laid on

19  me and while I haven't read every word of that transcript, I

20  have read enough to have a fair degree of consternation about

21  the way that that deposition went.  While I have problems with

22  both sides, I particularly have problems with the way you, Ms.

23  Charney, who are a new face to me conducted that deposition.

24              I have the transcript of the deposition.  I don't have

25  -- nobody gave me a copy of any transcript that might exist of

*In re Silvia Nuer - 4/19/10* 3

1    our last conference call, but unless I am missing something I

2    thought the purpose of the Reyes deposition was to authenticate

3    a number of documents and the scope of inquiry that took place

4    in my view was breathtaking and very surprising to me.

5            Now I have stated before and I think somewhere in one

6    of the many submissions Mr. Teitelbaum acknowledged, that in

7    general an attorney's perceptions of relevance are not a basis

8    for directions not to answer in a deposition.  But this

9    deposition took place in the context of rulings by me prior to

10   the deposition which had both a context as to the purpose of the

11   deposition and standards as to relevance.

12           Now there appears to be a major disconnect here.  I

13   don't like speaking objections but I think that while there's

14   some blame to go around, perhaps more than a little blame to go

15   around to just about everyone other than Mr. Zipes, I've got

16   major problems, Ms. Charney, with the way you conducted this

17   deposition.

18           Now on the matter of the privilege concerns that Mr.

19   Zipes has, Mr. Zipes, I will hear what you have to say but it

20   appears to me that if a person is a bona fide agent of a person

21   who is subject -- who has a privilege entitlement, the fact that

22   the agent is communicating in an otherwise privileged

23   communication would not disable the owner of the privilege from

24   invoking it.

25           But with that said, I did not see enough to give me

*In re Silvia Nuer - 4/19/10*                                    4

1   comfort that any communications that were reflected in those

2   notes were for either they -- were from the lawyer to the

3   client, providing legal advice or were facts provided to the

4   lawyer for the -- with the reasonable expectation and purpose

5   that they were to secure legal advice and there are many

6   exceptions to the attorney-client privilege such as conveying

7   ministerial information such as conveying information obtained

8   from third parties or conveying information that's for other

9   than the purposes of securing legal advice in that call.  And

10  therefore, I am not of a mind to fully subscribe to either of

11  your positions and instead believe that I need to review the

12  documents in camera and if necessary, to get affidavits

13  submitted to me concerning the specifics which would go --

14  describe the purpose of the communication, the relationship

15  between the parties, the purpose of the call and all of the

16  things that would provide surrounding context for the invocation

17  of the privilege.  The fact that an agent for a client is

18  conveying -- is speaking to the lawyer or passing -- had some

19  communication with the lawyer does not by itself make it

20  privileged.

21          So those are my tentatives.  I will hear first from

22  you, Mr. Teitelbaum.

23          MR. TEITELBAUM:  Your Honor, would you like to hear

24  first on our March 31 letter and the conduct of the examination

25  or would you like Ms. Charney to respond?  I think, Your Honor,

*In re Silvia Nuer - 4/19/10*                              5

1   frankly put your finger on the concerns that we had.  I don't

2   want to belabor it.  You have said you've read the submission

3   and read the transcripts.  I was literally going to point out

4   that Mr. Zipes conducted the examination, finished in about --

5   just about under an hour.  The witness did everything that he

6   was -- answered every question within the scope of the March 17

7   and 18th rulings that was asked of him.

8        Ms. Charney conducted the examination and not only

9   covered the same ground but then went well beyond the scope and

10  by way of example just repeatedly asked the same question 18

11  times or 15 times with respect to the assignment and the

12  existence of an assignment other than the assignment of blank.

13  With respect to whether the mortgage that is at issue here was

14  actually in the trust, when in point of fact, Your Honor, just

15  by way of example, the Debtor's amended pleading filed in this

16  case, the amended objection in August of '09 attaches in Exhibit

17  C and the Debtor herself -- I'm sorry, Ms. Tirelli, counsel for

18  the Debtor, alleged that, just to quote, "Attached is Exhibit C

19  to show the Court that the Debtor's mortgage loan is included in

20  the trust."

21        So there was 45 minutes of questioning about

22  something, Your Honor, that the Debtor has acknowledged already

23  in the pleadings to demonstrate -- to try to support their

24  argument that in point of fact in 2008 when the Garvis and

25  Walter assignments were executed, their argument that those

*In re Silvia Nuer - 4/19/10*                                    6

1   documents would fall because Chase did not own the mortgage and

2   loan.  It was property of the trust.

3          So we spent an incredible amount of time covering

4   things that are not at issue.  Another perfect example were

5   questions relating to whether or not the trust could accept

6   loans which were in default when in point of fact the Debtor's

7   produced to us letters at the closing of the mortgage in January

8   of '06, signed or initialed by the Debtor that reflected the

9   first payment was not due until March 1, 2006 with a 15 day

10  grace period and the mortgage went into the trust by the

11  testimony on March 7.  So there was no issue of a default or any

12  of this that was questioned over several pages of the

13  transcript, Your Honor.

14         And, you know, as we said, this witness was produced

15  as custodian of records.  He testified to those records and

16  without any basis, Ms. Charney said well let's just assume that

17  none of your records can be relied upon; what other documents do

18  you have.  And that was almost essentially, Your Honor, the end

19  of the deposition at point.

20         So we do believe that Mr. Reyes has fully testified,

21  fully complied.  We believe we acted appropriately under 7030(c)

22  and (d) in directing the witness not to answer questions based

23  on Your Honor's order and suspending the depo and then

24  immediately filing this letter with the Court seeking this

25  telephonic conference.  I am not going to belabor the issues,

*In re Silvia Nuer - 4/19/10*                                    7

1   Your Honor, on that.

2          THE COURT:  All right.  Then speak to the privileged

3   aspect please, Mr. Teitelbaum.

4          MR. TEITELBAUM:  Yes, Your Honor.  On the issue of

5   privilege, we agree with the initial assessment, Your Honor,

6   that the fact that transactions -- communications go through an

7   agent, under the law including *Covell* (ph.) in the Second

8   Circuit, hold that those do not waive the privilege.

9          Part of the problem and the confusion that some of the

10  documents -- and I tried to explain this to Mr. Zipes and it's

11  all obvious difficult -- is when you look at the LPS (ph.)

12  documents that were produced, these notes, you have to actually

13  read them from the back forward and from the bottom up because

14  they're essentially in reverse email chain or it's not email but

15  that's how you would have to read them.  And so if you read them

16  from the front forward you say well why is this communication,

17  originated by Fidelity or an LPS person apparently to no one,

18  privileged?  The answer is that two or three entries prior to

19  that, there was a communication from the Baum firm setting forth

20  this is what's going on in the case.  This is what we need to

21  do.  This is what we need.  And then the protocol that the LPS

22  person resubmits that information in a follow-up input so that

23  someone from Chase or WaMu can see it more readily from LPS.

24          So the things that we redacted, Your Honor, and we

25  have no issue producing them to the Court which we would like to

*In re Silvia Nuer - 4/19/10*                                    8

1    try avoid burdening the Court and maybe Mr. Zipes and I can sit

2    down and -- if we can do it in confidence, I could walk him

3    through some examples of that and alleviate the issue, but I

4    just want to make sure that by doing so we don't waive the issue

5    of privilege.  But as what happens with these kinds of things,

6    you unfortunately need to see the whole communication to

7    appreciate why we did what we did.

8              THE COURT:  All right.  Well I haven't given Mr. Zipes

9    a chance to be heard yet and of course I will, but I'd give you

10   a non-waiver protection in the blink of an eye if a lawyer

11   communicates to the client something that's going on in the

12   case, that of course is not privileged.  I didn't understand you

13   to be contending that it was but it is, of course, a poster

14   child for the example that I gave of -- the articulation of the

15   law that I gave that some communications between lawyers and

16   clients are privileged and others are not.

17             Certainly Mr. Zipes is entitled to be heard both on

18   the underlying legal principles and on the future approach but

19   my tentative would be that anything where you can satisfy Mr.

20   Zipes you can provide him with information without a waiver and

21   then if Mr. Zipes wants me to rule on any issues where you and

22   he have agreed to disagree, he's entitled to that.

23             And in terms of the total burdens that this case has

24   been, this is like a sand -- a grain of sand on the beach.  So

25   let me hear next from Debtor's counsel and then we won't forget

*In re Silvia Nuer - 4/19/10*                                                    9

1   about Mr. Zipes before we're done.  I do have to caution you

2   that we have a relatively limited amount of time to deal with

3   all of this stuff today.  I have major hearings in Cantura (ph.)

4   which have both a full trial and a major litigated matter

5   thereafter.  So we've got to stay on schedule today.  All right.

6           MS. CHARNEY:  Judge, this is April Charney and I

7   appreciate the Court's opportunity to make my presentation.  The

8   purpose of -- as I see my role on behalf of the Debtor in this

9   case is to show the Court that there was fraud committed on the

10  Court.  And in the course of that fraud, it harmed this Debtor,

11  Ms. Nuer.

12          The way that the fraud was committed as alleged by the

13  US Trustee and by Ms. Nuer is that the entities that presented

14  the documents to the Court, the instruments, the assignments,

15  were fully aware at the time that these documents were filed

16  that they did not represent truth.  In other words, these

17  assignments were housekeeping efforts to try to fix assignments

18  and transactions that were supposed to occur pursuant to a

19  pooling and servicing agreement that were never performed or

20  accomplished.

21          So the fact that at the time Linda Tirelli,

22  representing Ms. Nuer, filed a pleading with the Court

23  evidencing a list of loans, was because the discovery was not

24  complete enough at that time to understand that that list of

25  loans was strictly a hearsay document without any foundation.

*In re Silvia Nuer - 4/19/10*                                          10

1    The lack of foundation is presented by the fact and that's

2    perhaps why the Court thought I was going far afield in the

3    deposition because without understanding the document

4    requirements under the pooling and servicing agreement which

5    incorporate both securitization provisions and also a REMIC or a

6    real estate mortgage investment conduit tax shelter provision

7    because all of these securitized trusts are passive tax through

8    trusts, that these -- there are specific documentation

9    limitations.  The only way these trusts can own their documents

10   is when they execute documents in a timely fashion and transfer

11   interest in property through a series of bankruptcy remote

12   vehicles within a very short timeframe.

13          And the effort for this witness was to show that this

14   transaction requirement under its own pooling and servicing

15   agreement in fact did not occur.  Without being able to tie in

16   both the requirements of the Uniform Commercial Code, layered as

17   it is with REMIC limitations imposed by the IRS and put in

18   specific detail in the pooling and servicing agreement, it is

19   very difficult to try to show the Court that these parties were

20   fully aware at the time that they filed these documents that

21   they knew that they didn't -- that the Trust did not own this

22   loan.

23          And although I see this as a Legal Aid lawyer in every

24   case that I am involved in, to tie it specifically to the Nuer

25   loan really requires the opportunity for the Trustee and for Ms.

*In re Silvia Nuer - 4/19/10*                                          11

1   Nuer to be able to inquire of these very specialized witnesses

2   how they operate under their own pooling and servicing

3   agreement.  And so what we end up with is a hearsay list of

4   loans that wasn't ever filed with the pooling and servicing

5   agreement.  What we're left with is very loose ends as to when

6   this loan was actually placed into the trust because the

7   documents say one thing after the fact, after a default.  We

8   have written documents or instruments showing a transfer but the

9   pooling and servicing agreement says that this transfer had to

10  occur at a very specific time, at a time when the loan was first

11  performing within 120 days of when this '06 trust was

12  established (indiscernible) --

13          THE COURT:  Stop, Ms. Charney.

14          MS. CHARNEY:  -- after the (indiscernible).

15          THE COURT:  Stop.  Enough.  I let you go on and on and

16  on without interrupting but at this point, you've taxed my

17  patience.  You've pushed me too far.  Did you read the

18  transcript of the last hearing I had and my rulings and of the

19  arguments that were made to me?

20          MS. CHARNEY:  Yes, Judge and I have read every

21  transcript in this case that I could get my hand on.  My

22  impression was that there was --

23          THE COURT:  Please answer my questions and don't

24  answer more.  And then I will give you another chance to be

25  heard.

*In re Silvia Nuer - 4/19/10*                           12

1      MS. CHARNEY:  Yes, Your Honor, I have read the

2  transcripts.

3      THE COURT:  All right.  Now wasn't this guy supposed

4  to be produced as a document custodian?

5      MS. CHARNEY:  He was -- correct.

6      THE COURT:  And the purpose of deposing a document

7  custodian is to authenticate documents; isn't it?

8      MS. CHARNEY:  Judge, he was also produced as a signer

9  of a document.

10     THE COURT:  And from that you conclude that you can

11 inquire as to things other than what he signed and what he

12 thought he was signing and why he was signing it?

13     MS. CHARNEY:  Judge, it's the -- he testified that

14 this was his department and he was in control of the flow and

15 control of documents involved in this loan and this securitized

16 trust.  And he actually executed one of the assignments at

17 issue.  So the question was where did his authority come from to

18 execute that assignment?  And if it came under the pooling and

19 servicing agreement, show me where that power came from.

20     MR. TEITELBAUM:  Your Honor, Jay Teitelbaum, quickly.

21     THE COURT:  No, Mr. Teitelbaum.  It's not your turn.

22     MR. TEITELBAUM:  Okay.  Thank you.

23     THE COURT:  You may continue, Ms. Charney, but I am

24 not particularly interested in your perceptions of what is

25 required for tax deductions or your perceptions of what is

*In re Silvia Nuer - 4/19/10*                    13

1   required to achieve securitizations.

2          MS. CHARNEY:  I understand, Judge, but one element

3   that I think is necessary for this case is to bring in the

4   pooling and servicing agreement because that's the only way that

5   this trust can own the loan and that's the only way to show that

6   there wasn't fraud committed on the Court.

7          THE COURT:  Well do you have a copy of the pooling and

8   servicing agreement?

9          MS. CHARNEY:  We do and it was actually part of the

10  exhibits that were given to the witness and to Mr. Teitelbaum

11  prior to the deposition.  I was referring to an exhibit of the

12  deposition.  Also, the master loan purchase agreement was part

13  of the exhibits given to the witness and I didn't even get to be

14  able to question the witness as to the loan purchase agreement

15  because there should have been transfer receipts and certificate

16  receipts if these -- if this loan was actually transferred

17  through the bankruptcy remote vehicles, there should be transfer

18  receipts for each transfer.  And Ms. Nuer's entitled to discover

19  that and that is where I was just shut down.

20          And then with all due respect, Judge, I am only

21  looking to get the document trail that should be under their own

22  pooling and servicing agreement.

23          THE COURT:  And were you shut down on a question like,

24  "Did you ever see a document," and then you fill in the blank?

25  Because I read the -- I have been doing this 40 years, Ms.

*In re Silvia Nuer - 4/19/10*                              14

1   Charney, and I have rarely, if ever, seen a deposition that was

2   as argumentative and as ineptly conducted as the one you took,

3   with all due respect.

4        MS. CHARNEY:  Judge, I appreciate that and I was -- I

5   am not used to -- first of all, it was via Skype.  And second of

6   all, you know, with all due respect to Mr. Teitelbaum, he was

7   exceptionally disruptive.  If you actually pull out my

8   participation, most of my deposition time was occupied by Mr.

9   Teitelbaum.  And so it was exceptionally hard even to keep a

10  chain of thought, much less remember that I was trying to tie

11  the Nuer loan into a pooling and servicing agreement that's 700

12  pages long and a master loan purchase agreement that's probably

13  another 60 pages long.

14        And although the Judge -- I appreciate, but the

15  agreement language is part of the pool -- it's probably 60 pages

16  in a pooling and servicing agreement.  It very specifically says

17  that the loan has to go this place within 120 days and then to a

18  depositor, then into a sponsor and then to the trustee.  And

19  what you have is a after the fact document created in

20  anticipation of litigation and then the only way Ms. Nuer or the

21  trustee is going to be able to show that to the Court is by

22  documenting the failures under the pooling and servicing

23  agreement and a master loan purchase agreement.

24        And we have, even for the deposition that's set for

25  tomorrow with another signer, we have to be able to show the

*In re Silvia Nuer - 4/19/10*                                    15

1   failure -- what we call a failure to launch the original loan

2   into the trust through the bankruptcy remote vehicles.  And it's

3   not so much that they didn't create an after the fact document,

4   we all know that that happened, the question is was that fraud

5   on the Court?  And I have to be able to show for Ms. Nuer that

6   they were fully aware that they didn't own this loan under the

7   trust because it's own trust agreement made them fully aware.

8           And it's a document issue of whether they were fully

9   aware, not what was in a corporation's mind -- in my mind

10  anyway.  And so I am looking for the trail to show me the

11  missing documents, the missing links, because there are so many

12  missing links that they had to be fully aware when they filed

13  these documents with the Court, that they knew the trusts

14  couldn't possibly own this loan.

15          And I realize that up until now, the pooling and

16  servicing agreement has been a minor player in this case but I

17  hope and the reason that I traveled all of the way from

18  Jacksonville to participate in this New York bankruptcy is to

19  make sure that there was careful attention paid to the fact that

20  the only engine that runs this trust is its own pooling and

21  servicing agreement.

22          THE COURT:  All right.  Ms. Tirelli, do you have

23  anything to add?

24          MS. TIRELLI:  Your Honor, my concerns (indiscernible).

25          THE COURT:  Before you begin, Ms. Tirelli --

*In re Silvia Nuer - 4/19/10*                    16

1          MS. TIRELLI:  Yes?

2          THE COURT:  Before you begin, I read your supplemental

3    letter and I had problems different in character but material

4    problems with your letter, too which seemed to be focusing on

5    everything except the issues and how could you possibly ask me

6    to appoint a special master consistent with what the bankruptcy

7    -- Federal Rule of Bankruptcy Procedure provide?

8          MS. TIRELLI:  Well, Your Honor, the problem is at the

9    end of this deposition, I was hoping to not have to get into

10   this but Mr. Teitelbaum did stand over me with his hands in my

11   face and at one point told me to get the hell out of his office.

12   It's a violent gesture.

13          I am trying to come up with suggestions and ways that

14   perhaps we can continue to proceed in this case but I have some

15   safety concerns.  And I suggested to Mr. Teitelbaum that we hold

16   the future depositions on a neutral ground and not in his office

17   and then perhaps we could have another party present who can,

18   you know, stand over this and what not.  Your Honor, I don't

19   know what else to suggest.

20          THE COURT:  Mr. Zipes, can you bring some order to

21   this chaos, please?

22          MR. ZIPES:  Judge, I -- where do I begin?  Judge,

23   first of all with respect to my letter to the Court, I do think

24   I can sit down with Mr. Teitelbaum.  You will recall that I put

25   one other discovery dispute before this court which was the LPS

*In re Silvia Nuer - 4/19/10*                                    17

1  deposition of Scott Walters and Mr. Walters is, in fact, coming

2  back tomorrow.  We haven't had extensive discussions with his

3  counsel after the Court hearing on my letter describing the

4  discovery dispute.  So I hope that you won't hear about that

5  discovery dispute anyway.  I will sit down with Mr. Teitelbaum.

6         But I do -- I did write this letter because we have --

7  we may have an issue to put before the Court.  It appears that

8  LPS is an intermediary between the attorney and the client here.

9  And as I heard Mr. Teitelbaum state in the notes, there's some

10 sort of summary of what counsel was saying which was then passed

11 on to the client through LPS.  LPS is not the counsel here and

12 if they're summarizing notes of what the attorney is saying for

13 passing on to the client, then that might be an issue.  The

14 element --

15        THE COURT:  What do you mean that might be an issue?

16        MR. ZIPES:  It might be an issue as to the overall

17 issues in this case which are how did we come up with bad -- a

18 motion that contained bad information, a motion to vacate the

19 stay filed by Chase which contained bad information?  There

20 simply was indirect communication between the client the

21 principal here.  It went through some third party.

22        Judge, as I said, I will sit down with Mr. Teitelbaum

23 to go over him notes.  We may be able to come up with something.

24 But I will point out that one thing that wasn't in my letter is

25 in the operative document between Chase and LPS, there is a

*In re Silvia Nuer - 4/19/10*                           18

1   reference in these notes that you've been hearing about and

2   there's a reference in Article 5.5, which says that if there is

3   a discussion of legal matters, that should go outside the flow

4   of these notes.  That's the way I read this.  So that's another

5   reason why these notes from LPS, generated by LPS and LPS

6   employees shouldn't deal with attorney-client issues.

7          Again, Judge, we will sit down and we'll inform the

8   Court if we need further Court intervention on that but --

9          THE COURT:  Okay.  Pause please, Mr. Zipes.

10         MR. ZIPES:  Okay.

11         THE COURT:  Do you want to be heard and I take no

12  disrespect from this, on the issue as to whether my

13  understanding of the law -- of the role of agents who are

14  middlemen in attorney-client provisions is correct or not?

15         MR. ZIPES:  Oh, Judge, the issue here, the -- we

16  discussed the Second Circuit case which is relevant here and it

17  came after the *Novell* (sic) case -- the *Covell* case which is the

18  *Eckerd* (ph.) case.  And in that case, when the communication

19  between an attorney and a third party that doesn't prove -- that

20  doesn't help the attorney to interpret what the client's

21  position is, then that's not protected by the attorney-client

22  privilege.  So there is an exception to that agency principle.

23         And here with LPS, LPS' role from what we understand

24  is simply as an intermediary.  So we're wondering why a

25  communication from LPS should be subject to the attorney-client

*In re Silvia Nuer - 4/19/10*                                    19

1    privilege.  It's LPS -- it's an intermediary.  And it's not

2    clear why that would be protected.

3             THE COURT:  Well I understand that but that's fact

4    driven.  Now if by way of example the lawyer says I want you to

5    tell your principal that my advice on X, Y or Z is the

6    following, it seems to me that's privileged.  If it's on

7    something less than that, I've got to read it to see whether it

8    passes muster or not.

9             Now that's why I want you to have the dialogue with

10   Mr. Teitelbaum and if you and he don't have an agreement or if

11   you don't have enough information so you can say fine, I'm

12   satisfied, then Mr. Teitelbaum's to show me the document and I

13   will read it.  And if I can't tell from reading it whether or

14   not the privilege applies, I will tell him that he's got to give

15   me an affidavit with a copy to you.

16            MR. ZIPES:  Judge, that's completely acceptable.  So

17   that will dispose of that issue hopefully and you won't hear

18   from us again on it, I don't think.

19            THE COURT:  All right.  Now --

20            MR. ZIPES:  The other issue --

21            THE COURT:  Yes, please.

22            MR. ZIPES:  -- Judge, my office as we stated from the

23   beginning was concerned about this motion to vacate the stay

24   which contained improper, incorrect information of these

25   assignments, how they were produced.  The purpose of the

1   discovery from our office's point of view is to see if the

2   procedures have changed in coming up with this motion to vacate

3   the stay which was put before the Court, is flawed in some way

4   that requires sanctions or injunctive relief or some other

5   further relief from the Court.  That's what the purpose of

6   discovery is.

7           We understand that the Debtor has counsel that

8   believes that there's a fraud on the Court and that may very

9   well be the case but we need to play out with discovery to see

10  what the discovery says.  So to me when I was listening to this

11  deposition and the questions, if Ms. Charney believes that

12  there's a missing link here, that's Chase's burden.  She could

13  have asked that question of Chase.  It seems that the Chase

14  person was answering the questions in a way that was supporting

15  her theory and that she believes that there's missing documents

16  or that that something was creating after the fact.  So that was

17  the purpose of the discovery and the deposition.

18          Judge, I am not going to -- my office was able to ask

19  its questions, so I am not -- I don't know that it's appropriate

20  for me to get too involved with that aspect of the discovery

21  dispute.

22          THE COURT:  All right.  Mr. Teitelbaum, anything

23  further before I rule?

24          MR. TEITELBAUM:  Your Honor, just -- I don't know if

25  Your Honor -- I just -- I don't want to dignify with a response.

*In re Silvia Nuer - 4/19/10*                                        21

1   I will just say Ms. Tirelli isn't overreacting, she is simply

2   not telling the truth about what happened.

3           MR. ZIPES:  Just -- I'm sorry.  Greg Zipes.  I

4   apologize for interrupting Mr. Teitelbaum.  On the issue -- on

5   that issue, I think it might be best that these depositions do

6   take place on neutral ground because there is a tension there.

7   I am -- it just might make sense.  I offer my offices.  We're

8   not exactly a neutral office in this case but I offer my offices

9   or we can rent a room somewhere but that really drives up costs

10  and doesn't really make a lot of sense.  I offer my offices

11  though for any depositions.

12          THE COURT:  All right.  Mr. Teitelbaum?

13          MR. TEITELBAUM:  Your Honor, I have no problem

14  conducting depositions at the UST's office.  Mr. Zipes was

15  actually present at the end of the deposition.  There was no --

16  again, I am not going to even dignify it.  It's just not true.

17  Ms. Tirelli and I were standing -- each standing about three

18  feet apart and we were -- our voices were certainly raised and

19  tensions were high.  That's it.  You know, I will leave it at

20  that.  There -- I will leave it at that.

21          The fact is that in response to -- and with respect to

22  LPS, we'll work with Mr. Zipes and I am confident that we'll be

23  able to resolve most, if not all of those issues.  We'll get

24  with him immediately on that one.

25          With respect to the comments from Ms. Charney, what I

*In re Silvia Nuer - 4/19/10*                                    22

1   was -- the reason I sort of chimed in prematurely was that I

2   heard Ms. Charney saying Mr. Reyes is a signer of one of the

3   assignments.  He's not.  He executed an affidavit in connection

4   with our supplemental pleading where he identified specific

5   documents.

6         But Your Honor may recall it's Scott Walter and Ann

7   Garvis that executed the assignments which are at issue.  He did

8   not execute any documents in connection with this particular

9   loan, has no personal knowledge, not surprisingly, of this

10  particular loan.  He was produced as a document custodian.

11        With respect to the balance of the issues under the

12  PSA, I just keep coming back to, Your Honor, Mr. Reyes testified

13  based upon the business records, very specifically, when the

14  documents were brought into the trust, what documents were

15  brought into the trust, when those documents actually left the

16  physical possession of the trustee to come to counsel in

17  connection with this litigation, when they were returned.  Those

18  business records are uncontroverted, Your Honor.  The other

19  business records that have been produced to date identified the

20  mortgage loan, even the trust including the documents testified

21  to by Mr. Herndon in his deposition, including the mortgage loan

22  purchase schedule identified by Mr. Herndon at his deposition,

23  Your Honor.

24        So simply the PSA here is an agreement among parties

25  to which Ms. Nuer is not a party to that agreement, has no

*In re Silvia Nuer - 4/19/10*                                    23

1    interest in that agreement, not a third party beneficiary and

2    the real issue here is --

3         THE COURT:  Well that is not by itself sufficient, Mr.

4    Teitelbaum.  The issue is not whether or not she was named as a

5    third party beneficiary but whether she knows about it or not,

6    that document effects her rights in some way or even though it

7    may have been a broader document, it covers her.

8         Now that would seemingly be determined by what the

9    document says and by any exhibits to it, and by possibly any

10   other documents that are put together with it.  I don't know

11   whether Reyes would have any knowledge about this or not but it

12   appeared to me upon my review of the transcript of this

13   deposition, that the wrong questions were asked but that's

14   subject to people's rights to be heard would be the way that I

15   would be legally analyzing it unless one of you guys showed me I

16   was in error in that regard.

17        MS. CHARNEY:  Judge, this is Ms. Charney again and I

18   just wanted to make sure the Court understood, I consider a

19   signer to be someone who also signs these affidavits and so the

20   credibility or admissibility of Mr. Reyes' affidavit was in

21   front of me when I was taking the deposition.

22        THE COURT:  But you were inquiring on some things that

23   were very far afield, such as an instance in which what may have

24   been a typographical error but maybe nothing more than that was

25   on a document that had a name looking an awful lot like his in a

*In re Silvia Nuer - 4/19/10*                                    24

1   wholly different context.

2          MS. CHARNEY:  Oh, well that was related only to -- and

3   this is because -- again, Judge, I appreciate that you don't

4   know me from Adam, but I come to this case with some background

5   in doing these depositions.  And I am aware and I have documents

6   in front of me to question this man's credibility and

7   reliability.  So the relevance of the question was to show that

8   he's -- you know, if I was to make a proffer it would be to show

9   the Court that he has executed documents on file in Clark

10  County, Nevada and with the FTC where he spells his name and

11  lists his position and many different aliases, not just one or

12  two.  And I felt that that was appropriate to determine who my

13  deponent was and whether he was a credible, reliable witness and

14  that would go to very much whether his affidavit which does

15  relate directly to the pooling and servicing agreement, is

16  admissible evidence or whether it's fraud on the Court.

17         THE COURT:  All right.  Mr. Teitelbaum, you were

18  interrupted.  Do you have anything further to say?

19         MR. TEITELBAUM:  No.  No, Your Honor.  This is just

20  more to and fro.  I think -- I honestly believe that the

21  transcript does speak for itself and that's why we did not

22  editorialize it.

23         THE COURT:  All right.  The transcript does speak for

24  itself.  I'm ruling that Mr. Teitelbaum was substantially

25  justified in shutting down the deposition, not totally but

*In re Silvia Nuer - 4/19/10*                    25

1  substantially.  I've already given you my ruling on the

2  resolution of Mr. Zipes' privilege issues.

3       Vis-a-vie the future of this, I think that this

4  deposition went dramatically off track and my view is that

5  because of its importance, I am not going to shut it down for

6  all time.  I am ruling that any further deposition questioning

7  has to be done by Ms. Tirelli on behalf of the Debtor because I

8  am not sure if you still get it, Ms. Charney, in terms of my

9  rulings.

10      With the future of the deposition, I want both sides,

11 because I see you mainly as a bystander, Mr. Zipes -- that's not

12 to say you can't participate but I want both sides to read the

13 transcript of my earlier ruling.  I thought Reyes was being

14 produced as a document custodian.  And after 40 years, I have an

15 understanding of what I think a document custodian can testify

16 to.  And he or she testifies as to the authenticity of any

17 signature, the authenticity of any document to the extent he

18 knows and because I don't want to be too restrictive in this,

19 his first hand knowledge of any document he signed, what he

20 thought he was doing or signing, why he was doing it or signing

21 it.

22      In addition, I will permit identifying a document of a

23 particular character and asking him whether he ever saw a

24 document of that character in connection with anything that

25 might affect Ms. Nuer, and if he has knowledge as to whether

*In re Silvia Nuer - 4/19/10*                              26

1   such documents are prepared in transactions that could have an

2   affect upon Ms. Nuer.  I am once more saying that I am not

3   authorizing an examination into the mortgage servicing industry

4   across the United States and without more concerning the

5   truthfulness of Mr. Reyes in connection with this transaction, I

6   am not authorizing a free-standing inquiry into anything that

7   might be argued to bear upon his credibility in general.  In

8   other words, I am authorizing impeachment but not on extrinsic

9   facts.

10          Now lastly, on any affidavit that Reyes signed in

11  connection with Ms. Nuer or this case, either on the litigation

12  front before me or in any state court proceedings or as a

13  predicate for any state court proceedings, he may be questioned

14  on material relating to his execution of that affidavit or any

15  facts that are set forth in that affidavit.

16          The further deposition will take place at Mr. Zipes'

17  office which he graciously agreed to make available and we're

18  going to do it again, folks, until we get it right.

19          MS. TIRELLI:  Your Honor?

20          THE COURT:  Who is speaking?

21          MS. TIRELLI:  It's Linda Tirelli, I am sorry.  I'm

22  sorry, did Your Honor finish?

23          THE COURT:  Yes.

24          MS. TIRELLI:  Did I interrupt?

25          THE COURT:  No, you are okay.  Go ahead.

*In re Silvia Nuer - 4/19/10*                              27

1      MS. TIRELLI:  Okay.  Thank you.  With regard to this

2   future depositions, I do have other counsel assisting me now in

3   this case.  And it would be important, I think, to just you know

4   help with my burden to have other attorneys doing the

5   questioning.  I will be present at the deposition.

6      THE COURT:  Well she can help you but I have read this

7   transcript, Ms. Tirelli, and I don't have confidence in this

8   deposition serving the interest of justice.  Now, I mean I

9   didn't even talk about the five or six or eight questions

10  talking about who Mr. Teitelbaum was representing.  That was

11  nonsense.  He answered the question.  I highlighted his answer

12  and then the questions go on, three, four, five times

13  thereafter.

14     MS. TIRELLI:  Well, Your Honor, I have other attorneys

15  that are also helping me now in this case that I indicated to

16  Your Honor in January.  If I felt I needed help, I would pull in

17  additional help as I am able.  I do have attorney Max Gardner

18  (ph.) here from the North Carolina, who probably knows more

19  about LPS than anyone in the country and I think it would be

20  very useful to have him conduct the deposition tomorrow.

21     THE COURT:  Well I am not saying that he can't

22  examine.  I am simply saying I don't want Ms. Charney doing it.

23     MS. TIRELLI:  Okay.  Understood, Your Honor.

24     THE COURT:  Now if you guys think that as a matter of

25  law she has the right to do it, you can give me a letter with

*In re Silvia Nuer - 4/19/10*                                    28

1  some authority on it and obviously I will consider that.  Now

2  have I gotten and granted a pro hac motion?

3          MS. TIRELLI:  Yes, you have, Your Honor.

4          THE COURT:  All right.  Well she is certainly

5  authorized to speak on the phone and to write briefs and if you

6  think there is some law of which I was unaware that says that I

7  think -- that if I think a lawyer was not serving a client well

8  and was acting in a way where I had to grant a motion approving

9  the shutting down of a deposition, I will consider that.

10          MS. TIRELLI:  Okay.  Thank you, Your Honor.

11          THE COURT:  We're adjourned, folks.

12          MS. TIRELLI:  Thank you.

13          MR. TEITELBAUM:  Thank you.

14          (This hearing concluded at 9:34:38 a.m.)

15                        - o0o -

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


I, Linda Ferrara, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Dated:  April 19, 2010

_____
Signature of Approved Transcriber